BRUSH and another *against* SCRIBNER.

Where a promissory note, made by *A*, and indorsed in blank by *B*, was entrusted to *C*, who had no interest in it, to get it discounted, at the bank, for *A*'s benefit; and *C* fraudulently delivered it to *D*, who, acting fairly and without knowledge of the fraud, received it in satisfaction and extinction of a pre-existing debt against *C;* in an action brought by *D*, against *B*, as indorser, it was held, that *D* was a *bona fide* holder of the note, for a valuable consideration, and, as such, was entitled to recover.

Where the verdict, in an action on contract, is in accordance with justice and the law of this state, a new trial will not be granted, to give the party the benefit of the law of another state, not particularly insisted on at the trial, though the contract was made, and the parties resided, in that state.

THIS was an action on the endorsement of a promissory note. The parties were thus described in the writ: "*Jarvis Brush* of the city of *Brooklyn*, in the county of *Kings*, in the state of *New-York*, and *Edward Cook*, of the city of *New-York*, partners and merchants in company, by the name and firm of *Brush & Cook*, plaintiffs, against *John Scribner*, of the city of *New-York*, defendant." The note in question was made in the city of *New-York*, on the 4th of *December*, 1833, by *Abraham S. Scribner*, of that city, for 326 dollars, 50 cents, payable to the order of the defendant, four months after date, and by the defendant endorsed in blank.

The cause was tried at *Danbury, November* term, 1835, before *Church*, J.

The defendant claimed, that this note was to have been discounted at the branch of the *Fairfield County Bank*, in *Danbury*, for the benefit of the maker; that it was, for that purpose, delivered to *Eliphalet B. Stevens*, who had no interest whatever in it; and that he fraudulently negotiated it, without the knowledge of the parties to it.

The plaintiffs claimed, that on the 3rd of *January*, 1834, *Stevens*, being indebted to them for goods previously sold, in the sum of 112 dollars, 85 cents, delivered this note to them in payment, and received from them the balance in cash and goods.

It was admitted, that the plaintiffs had conducted fairly, and without knowledge of the circumstances which the defendant claimed to have existed; and that the defendant or maker of the note paid to the plaintiffs what was due upon the note, ex-

cept the sum of 112 dollars, 85 cents, which, he claimed, the plaintiffs were not entitled to recover in this action.

The judge instructed the jury, that if the note was delivered to the plaintiffs, and by them received, as collateral security only for a previous indebtedness; or if it was only to be applied in payment thereof, when collected; this would not constitute such a valuable consideration as would entitle the plaintiffs to recover. But if the note was delivered for the sole use and benefit of *Stevens ;* or if it was delivered, by *Stevens,* to the plaintiffs, and by them received, as a satisfaction and extinction of said previous indebtedness ; the plaintiffs were entitled to a verdict.

The jury returned a verdict for the plaintiffs; and the defendant moved for a new trial for a mis-direction.

*Sherman* and *Betts,* in support of the motion, contended, 1. That a note indorsed for the accommodation of the maker, and fraudulently put into circulation, cannot be enforced against the endorser, by a holder without notice, unless he paid for it a valuable consideration. *Anon.* 1 *Salk.* 126. *Ford* v. *Hopkins,* 1 *Salk.* 284. *Miller* v. *Race,* 1 *Burr.* 452. *Grant* v. *Vaughan,* 4 *Burr.* 1516. S. C. 1 *Bla. Rep.* 485. *Peacock* v. *Rhodes, Doug.* 633. *Collins* v. *Martin* & al. 1 *Bos. & Pull.* 648. *Rees* v. *Marquis of Headfort,* 2 *Campb.* 574. *Bayley* on *Bills,* 500. (5th ed.) *Chitt. Bills,* 100 *i.* 100 *j.* (late *Am.* ed.) *Solomon* v. *Bank of England,* 13 *East,* 135. *n.*

2. That the term " valuable consideration," in commercial law, applied to a note so negotiated, imports a new contract, of which the note is the consideration, and on the credit of which the contract is made, and does not embrace its application in payment or security of an antecedent debt. Money or other value must be paid for it, at the time of the transfer. *Chitt. Bills.* 190. *Woodhull* v. *Holmes,* 10 *Johns. Rep.* 231. *Bay* v. *Coddington* & al. 5 *Johns. Ch. Rep.* 54. S. C. in error, 20 *Johns. Rep.* 637. *Vallett* & al. v. *Parker,* 6 *Wend.* 615. *Bristol* v. *Sprague* & al. 8 *Wend.* 423. *Wardell* & al v. *Howell,* 9 *Wend.* 170. *Rosa* v. *Brotherson,* 10 *Wend.* 85. *Hart* & al. v. *Palmer,* 12 *Wend.* 523.

*Hawley* and *Booth,* contra, contended, 1. That if a note be taken in the usual course of trade, for a fair and valuable con-

sideration, and under circumstances of due caution, the holder may recover against the maker and endorsers. 3 *Kent's Com.* 51. 2 *Stark. Ev.* 252. 282. 1 *Saund. Pl. & Ev.* 304, 5. *Hall* v. *Hale*, 8 *Conn. Rep.* 337. 340.

2. That the satisfaction and extinction of a previous indebtedness may constitute such valuable consideration. [Here the cases of *Bay* v. *Coddington* & al. and *Rosa* v. *Brotherson*, were much commented on.]

3. That the note in question having been taken under such circumstances, the plaintiffs are entitled to recover upon it the amount unpaid.

WILLIAMS, Ch. J. The defendant claims, that as to the 112 dollars, 85 cents, the antecedent debt, there was not such a consideration as would entitle the plaintiffs to a recovery; or at least, that such is the law of the state of *New-York*, which ought to govern the contract under which the plaintiffs claimed. That a want of consideration, as between the parties to negotiable paper, may be shewn, is well settled; and the same rule exists, where such paper comes into the hands of a third person, who was apprised of that fact. So when negotiable paper is made for a particular object, as when it is endorsed for a specific purpose, the endorser lending his name to accommodate the maker, as to renew another note, and the maker applies it to a different purpose, to the prejudice of the endorser, and this is known to the person receiving it, he shall stand upon no better ground than the fraudulent assignor. But if the assignment of such note or bill is a fraud upon the endorser, yet a *bona fide* holder for a valuable consideration, without notice, to whom such note or bill has been transferred, will be protected in receiving such paper, in the usual course of business.

It was long since decided, that when a bank note payable to *A* or bearer, was lost, and found by a stranger, and by him transferred to *C*, for a valuable consideration, *A* might have trover against the stranger, for he had no title to it; but not against *C*, by reason of the course of trade, which creates a property in the assignee or bearer. 1 *Salk.* 126. So where an inn-keeper received a bank note from his guest, in the course of his business, and paid the balance, he was permitted to retain it, although the note had been stolen from the mail; because he

*Fairfield,*
June, 1836.

Brush
*v.*
Scribner.

had received it fairly and honestly, in the usual course of business. It shall never be followed, says Lord *Mansfield*, into the hands of the person who took it *bona fide*, in the course of currency, and in the way of his business. *Miller* v. *Race*, 1 *Burr.* 462. And where a bill or draft was drawn payable to the ship *Fortune*, or bearer, and it was lost, and paid by the finder for tea to the plaintiff, he paying the difference between the price of the tea and the draft in cash, fairly and *bona fide*, it was held, that there was no distinction between that and a bank note. And *Wilmot*, J. said, "having been taken fairly and *bona fide*, in the course of trade, and being negotiable, the plaintiff was entitled to recover." *Grant* v. *Vaughan*, 3 *Burr.* 1516. And where a bill, drawn by the defendant, payable to *W* or order, and endorsed in blank, by the payee, was stolen and passed for goods, Lord *Mansfield*, in giving judgment, says, the law is settled, that a holder coming fairly by a bill or note, has nothing to do with the transactions between the original parties, (unless in the single case of a note for money won at play.) I see no difference, says he, between a note endorsed in blank and one payable to bearer : they both go by delivery, and possession proves property in both cases. It was received in the course of trade ; therefore, the case is clear. *Peacock* v. *Rhodes, Doug.* 633.

Thus stands the law, as settled by Lord *Mansfield*. Bank notes, bills of exchange, promissory notes payable to bearer, or to order when endorsed in blank, are all placed upon the same footing, and for the same reason ; because these principles alone would secure their free circulation. The *bona fide* holder of such instruments, having received them for a valuable consideration, in the usual course of business, must be protected against the claims of the original owner, by whose misfortune or negligence, one of two innocent parties must suffer. As between the former owner, who has been robbed, and a subsequent *bona fide* holder for value, it is certainly a case of great hardship : it has, however, been settled, by eminent judges, upon principles similar to those which validate sales of stolen goods in market overt, or the circulation of coin, and has been acquiesced in. The liability of parties to a bill of exchange or promissory note has been fixed, says *McLean*, J., on certain principles, which are essential to the credit and circulation of such paper. These principles originated in the convenience of com-

*Fairfield,*
*June, 1836.*

Brush
*v.*
Scribner.

mercial transactions and cannot be departed from.  *Bank of U. S.* v. *Dunn,* 6 *Pet.* 59.

But as it respects cases of this kind, where one person has confided his name on a note or bill to a servant or a friend, and thus enabled him to appear to the world as owner, and as having a lawful right to dispose of it, if that confidence is misplaced, the principles of equity, as well as of commercial law, require, that he who has thus put it into the power of another to defraud should himself sustain the loss, rather than the person who has given credit to these appearances.   It is not perceived how the case differs, in principle, from that of a man who gives his name in blank to another to fill up a note over it for a certain sum, and his agent exceeds that sum ; or where he authorises a clerk to use his name in all his business, and the clerk uses it for his own purposes.  In the opinion of eminent judges, those who issue accommodation paper are not entitled to special favour, as it respects third persons. In *Kerrison* v. *Cooke,* 3 *Campb.* 362. *Gibbs,* J. says, he is sorry the term *accommodation bill* ever found its way into the law, or that parties were allowed to get rid of the obligations they profess to contract, by putting their names to negotiable securities : and in *Fentum* v. *Pocock,* 5 *Taunt.* 192. 197. *Heath,* J. says, courts have gone much too far in lending support to these mischievous instruments, the evils resulting from which, we see every day.  And the principle applies as well to the endorser as the maker : each gives the credit of his name to the instrument ; and the one contributes, as far as his name is concerned, as much as the other, to deceive the public as to the rights of the holder ; and the endorser constitutes the holder his attorney to the extent of such note or bill.

In the case before the court, it is not denied, that the plaintiffs received this note in the course of business, fairly and *bona fide,* and without any grounds for suspicion ; nor is it denied, that a valuable consideration was paid, so far as cash or goods were paid at the time.   But as to that part of it which went to satisfy an antecedent debt ; it is said, that it was not a valuable consideration.   That the satisfaction and extinction of a pre-existing debt, is, in the common acceptation of the term, a valuable consideration, cannot be doubted.  It is said, however, not to be the valuable consideration spoken of in the cases cited ; as in all those cases there was a present consideration.

*Fairfield,*
June, 1836.

Brush
*v.*
Scribner.

It is true, that in those cases, the paper was not taken for prior debts; but no reliance is placed upon that circumstance; and the rule is laid down in broad and general terms, as if intending to embrace all cases of negotiable paper, received fairly in the course of business, and for a valuable consideration given. When this term was used, the court certainly knew its legal effect, as well as its ordinary acceptation; and had they intended to have used it in a limited sense, it would have appeared in some of these cases. Besides, the great object of the rule was, to aid in the circulation of negotiable paper, by the security it gave to the *bona fide* holder from being involved in the conflicts which might arise between the original parties. But if all those who receive this paper for antecedent debts, are to be excluded from the benefit of this rule, it must greatly limit its operation. Had such been the practical construction, this distinction must have been well known and understood in the community; and it is difficult to believe, that a term so general as that of valuable consideration, would have been so often used, by such men as Lord *Mansfield* and J. *Wilmot*, when they meant to apply it only to a part, perhaps a small part, of those cases where a valuable consideration was paid. On a subject of such general interest to the commercial world as the free circulation of negotiable paper, it is believed no new distinction could have been intended to be introduced; but that a general principle was designed to be established, in making such paper as free in its circulation as the coin it represented. But that paper which cannot be safely taken in payment of debts, cannot be said to have a free circulation; and thus the great object of the rule would be defeated. It is true, that notes given upon usurious or gambling considerations form a class excepted from the rule. This, however, is founded upon statute regulations, and is said to be a hard case.

It is also apparent, that the more exceptions are introduced, the more embarrassments will exist in the circulation of such paper; and the injury to the circulation of bills and notes must be nearly as great, if they cannot be safely passed in payment of antecedent debts, as if it should be said, they should not be passed for goods sold. When we consider the sums annually paid for debts due at the custom houses, the state treasury, the school fund, the various banking institutions in the state, in addition to the payments upon individual debts, it is appa-

rent, that the restriction now proposed to be introduced, must, if adopted, have a great and alarming effect upon the circulation of negotiable paper. Before this court lend their aid to such an event, they must be clearly satisfied, that the law requires it.

How, then, stand the authorities? In the argument at the bar, not a case has been cited from the *English* books, or from our own, in support of the claim made by the defendant. It seems to the court, that after the general expressions used by the judges, who decided the cases above cited, those who claim that the term *valuable consideration* was used in a limited sense, are bound to show it. This they have not done. The court are not informed of any case, within nearly half a century after the decision in which such a distinction is taken. In the case of *Smith* v. *De Witts,* 6 *Dowl. & Ryl.* 120. (16 (*Serg. & Lowb.* 256.) *Abbott,* Ch. J. did, at *Nisi Prius,* say, that it would have made a difference whether the goods were sold upon the credit of the bill, or sold originally upon the personal credit of the person who put off the bill. In that case, the defendant, the acceptor of the bill, had placed it in the hands of one *Crozar,* to procure it discounted, and deliver to him the avails. *Crozar,* having committed an act of bankruptcy, fled to *France,* and the plaintiff followed him to procure payment for goods sold him, and received from him, at *Paris,* various securities, and amongst them this bill. On motion for a new trial, Ch. J. *Abbott* says : " If the bill had been accepted for value, the plaintiff could not have recovered upon it ; because *Crozar* being a bankrupt, it would have passed to his assignees." He adds, " can it be said that this bill, which is of no value, inasmuch as it passed from the defendant without consideration, and he being unlawfully deprived of it, the plaintiff has a right to sue upon it, and place himself in a better situation than the man from whom he received it ? It appears to me, that it would be contrary to the first principles of natural justice to say, that the plaintiff is a *bona fide* holder for value." *Holroyd,* J. says : " I agree, that if this bill had been delivered to a *bona fide* holder for valuable consideration, and a person ignorant of the circumstances under which it had been obtained from *Crozar,* he might sue the acceptor, notwithstanding any want of consideration received by him. But the argument goes a great deal farther ; for it assumes, that *Crozar* was not a bankrupt at the time the plaintiff received the bill. Now, at

that time, *Crozar*, assuming that he had possessed himself of the bill rightfully, had no authority to transfer a right to the plaintiff, by an endorsement. The plaintiff cannot be in a better situation than the person from whom he derived title. Assuming that the assignees might have recovered it, it is clear that the plaintiff had no title, because at the time the property in the bill, if *Crozar* had any, vested in the assignees." *Littledale*, J. concurred. Now, although there are expressions in the opinion of *Abbott*, Ch. J., which favour the defendant's position; yet when the case could be, and was, by him and his brethren, decided upon another ground, that this *Crozar* could not pay debts and transfer securities, after an act of bankruptcy, it is hardly to be supposed, that the Chief Justice meant to rely upon that as the ground of decision, which was so novel and so unnecessary. If he did, he does not seem to have received the countenance of his brethren; nor do we find this case cited, in after cases, in support of that opinion. It may be proper also to remark, that *Abbott*, Ch. J. speaks of his not being a *bona fide* holder for value; and that upon that subject, his notions were peculiar; that he required a degree of vigilance, on the part of the person who received a note or bill, which was as novel as embarrassing. *Gill* v. *Cubitt*, 9 *Barn. & Cres.* 466. (10 *Serg. & Lowb.* 154.) and which has in effect been recently overruled. *Crook* v. *Jadis*, 5 *Barn. & Adol.* 909. *Backhouse* v. *Harrison*, *Id.* 1098. (27 *Serg. & Lowb.* 234. 276.)

The case of *De La Chamitt* v. *Bank of England*, has been supposed to recognise the same distinction. *Chitt. Bills*, 91. (ed. 1836.) The action was trover for a bank note, which was detained as having been stolen from one *H.* The note was received by the plaintiff, from the house of *Odier & Co., Paris.* The course of business was, for the plaintiff, who resided in *London*, to remit to *Odier & Co.* in *Paris*, and *Odier & Co.* to him, and thus take advantage of the exchange, and divide the profits at the end of the year; each party to be answerable for the paper transmitted to the other. The defendant's counsel contended, that although *Odier & Co.* were indebted to the plaintiff, at the time this note was remitted, yet, as they had not given him any farther credit, on the faith of the note before notice, he must be considered as their agent, &c. Lord *Tenterden* held, that he must be considered identified

with *Odier & Co.;* and if they could not recover, the plaintiff could not. And upon the motion for a new trial, the same learned Judge remarks: " We think the plaintiff stands in the same situation as *Odier & Co.*, who sent the note to him. They were mutually agents for each other. Then he goes and states the balance due the plaintiff, but states that he did not give *Odier & Co.* any further credit, than if the note had not been transmitted." In this case, instead of placing the decision upon the broad ground that prior indebtedness was not a valuable consideration, which would have at once disposed of the case, the court take the ground, that the plaintiff was the agent of *Odier & Co.*, and must stand or fall with them. This case, therefore, impliedly admits, that a prior indebtedness, under other circumstances, might have been a sufficient consideration.

But there are other cases, bearing more directly upon this question. In *Collins* v. *Martin,* 1 *Bos. & Pul.* 648. 546., the plaintiffs brought trover for certain bills of exchange, which they had endorsed in blank, and sent to their bankers, to be received by them when due, and carried to their account; and the balance of account was in favour of the plaintiffs. These bankers deposited the bills with the defendants, and received a sum of money upon the deposite; the defendants knowing nothing of the circumstances under which they were received. The plaintiffs were non-suited; and *Eyre,* Ch. J. says: " For the purpose of rendering bills of exchange negotiable, the right of property passes with the bills. Every holder with the bills takes the property; and his title is stamped upon the bills themselves. The property and the possession are inseparable. This was necessary to make them negotiable." He adds: " But no evidence of want of consideration, or other ground to impeach the apparent value received, was ever admitted in a case between acceptor and drawer and the third person holding the bill for value; and the rule is so strict, that it will be presumed he does hold the bill for value, until the contrary appears." The case in which the opinion was given, was not indeed one, where the defendant claimed the bill on account of a prior indebtedness; and therefore, it has been supposed, that this eminent judge referred only to that class of cases, where value was received at the time of the transfer, in contra-distinction to those cases, where the consideration was a pre-existing debt. But that the Chief Justice recognized no such distinc-

tion ; nay, that he denied that any such distinction existed, is apparent from his remarks, in a case decided by him but a few years before, when he was Chief Baron of the *Exchequer,* in the case of *Plumb* v. *Fluitt,* 2 *Anst.* 433. 439. That was a bill in chancery, by one who had the title deeds deposited with him, as security against a person who had taken a mortgage of the depositor to secure an antecedent debt. The Lord Chief Baron says : "I wish I saw in a court of equity some solid distinction established between a consideration which is an old debt and a sum advanced *de novo.* There certainly is a great difference. In the one case, the creditor jumps at any security he can get ; he takes the deed of conveyance now, and trusts to get the title deeds afterwards ; but until such a distinction is established, it is difficult to apply the reasoning which would belong to it." This was not a case of negotiable paper ; and it by no means follows, that because the judge was anxious that a court of equity should make such a distinction in that case, he thought a court of law had such a rule regarding negotiable paper. If then no such distinction was known in a court of equity, in the case of an equitable lien on lands, where no principle regarding the circulation of negotiable paper intervened, can a doubt exist what this judge meant by value, in the case of *Martin* v. *Collins ?* And if courts of equity have not known such a distinction where transfers of land are concerned, it will not readily be believed, that such a principle was established in courts of law, in cases where the currency of the country was concerned, and that this should not have been attended to, by a learned judge.

The case of *Boehm* & al. v. *Sterling,* 7 *Term Rep.* 423., was tried within a year after *Collins* v. *Martin.* The plaintiffs' claim was founded upon a check, given by the defendants, as a counter security for an acceptance of *Muilman* and *Nantes,* which acceptance the defendants had themselves taken up ; so that the consideration of the defendants' check had entirely failed ; but it had been passed, by *Muilman* and *Nantes,* to the plaintiffs, for a valuable consideration, *viz.* (says the reporter) an *antecedent debt.* The question at the trial was, whether the check was over-due ; and Lord *Kenyon* says, the proposition on which the defendants rely, *is not that the plaintiffs have not given a valuable consideration for the check ;* and reproaches the defendants, in severe terms, for the defence

*Fairfield,*
*June, 1836.*

Brush
*v.*
Scribner.

which they interposed, which was founded upon a mis-dating of the draft by themselves. In this case, the sum in dispute was large ; (about 12,000 dollars) the counsel eminent ; (*Erskine* and *Gibbs*) the only consideration pretended, an antecedent debt. If there is any foundation, therefore, for the defendant's claim in this case, the defence in that case was complete ; and it was entirely overlooked, and the defendants were exposed to the censures of the judge for their audacity in the defence they made ; and neither counsel nor judge seemed to have imagined that an antecedent debt was not a valuable consideration.

So, where a bill of lading, which is a negotiable instrument, is endorsed and delivered, by the consignee, to a third person, *bona fide* and for a valuable consideration ; it passes the property of the goods, so that the original vendor cannot stop them *in transitu.* In a case where the assignee had received the assignment in payment of a debt then due, and for a further advancement, the jury, under the direction of Lord *Ellenborough,* found, that the consideration was a valuable one ; and that opinion must have been satisfactory to the court of *King's Bench,* as they refused a new trial. *Cuming* v. *Brown,* 1 *Campb.* 104. S. C. 9 *East,* 506.

In the case of *Wookey* v. *Pole* & al. 4 *Barn. & Ald.* 1. (6 *Serg. & Lowb.* 323.) the principal question was, whether an exchequer bill should stand upon the same ground as notes and bills of exchange. Still the facts in the case, with the opinion of the judges, have an important bearing upon the principles under discussion. The plaintiff being owner of a bill of 1000 *l.,* sent it, by his wife, to *Pawsey & Eaton,* stock brokers, to be sold and vested in stock. He endorsed the bill in blank. The defendants were also brokers ; and *Pawsey & Eaton* had a banking-house account with them, and deposited this bill with them ; and in consequence thereof, got divers credits, and drew out moneys at various times. On the 14th of *January,* the defendants had notice of the plaintiff's claims ; and they sold the bill on the 27th ; *Pawsey & Eaton,* having then drawn out all the money, except 46 *l.* 10 *s.,* and the account remained unsettled. The bill was demanded on the 14th of *January,* and the defendants refused to deliver it, claiming to have advanced money on its security. The plaintiff then brought an action of trover for the bill. The court

held, that the action could not be sustained, *Bayley*, J. dissenting. But that judge says: "The *bona fide* holder, and for a valuable consideration, of a bank note or bill of exchange, has a good title against all the world, because in the case of bank notes, they are considered as money; and it is essential for the purposes of trade, that delivery should give a perfect title; and because, in the case of bills of exchange, this is the law and custom of merchants." And *Holroyd*, J. says: "It has been long and fully settled, that bank notes or bills, drafts on bankers, bills of exchange or promissory notes, either payable to order and endorsed in blank, or payable to bearer, when taken *bona fide*, and for a valuable consideration, pass by delivery, and vest a title thereto in the transferree, without regard to the title, or want of title, in the persons transferring them. The courts have considered these instruments as appendages to money, and following the nature of their principal." And after citing *Miller* v. *Rice*, and other cases, he adds: "These authorities shew, that not only money itself may pass, and the right to it may arise, by currency alone, but further, that these mercantile instruments, which entitle the bearer of them to money, may also pass, and the right to them may arise, in the like manner, by currency or delivery. These decisions proceed upon the nature of the property, (*viz.* money) to which such instruments give the right, and which is itself currency; and the effect of the instruments, which either give to their holders, merely as such, the right to receive the money, or specify them as the persons entitled to receive it." And *Best*, J. says: " It has long been settled, that the right to money is inseparable from the possession of it. I concede, that the representative of money, which is made transferable by delivery only, must be subject to the same rules as the money which it represents." " It is not because the loser cannot know his money again, that he cannot recover it from a person who has fairly obtained the possession of it; for if his guineas or shillings had some private marks on them, by which he could prove they had been his, he could not get them back from a *bona fide* holder. The true reason of the rule is, that by the use of money, the interchange of all other property is most readily accomplished. To fit it for this purpose, the stamp denotes its value; and possession alone must decide to whom it belongs. If this be correct as to money, it must be so as to what is made to represent

money." And *Abbott*, Ch. J. says : "Notes and bills have been distinguished from goods, in regard to their transfer, for the convenience of trade and commerce, and in regard to their being mercantile and commercial instruments, and by law negotiable."

In this case, no particular examination seems to have been made as to the exact sums advanced upon this bill, at the time it was received, or when notice was given by the plaintiff ; nor was any claim made for the 46 *l.* 10 *s.* remaining in the defendant's hands. The court re-examine all the principles laid down by Lord *Mansfield*, without alluding to any such distinction or limitation as the defendant claims in the case before the court. And one of them gives a satisfactory answer to the claim, that money itself might be followed, if it could be traced.

In a subsequent case, that of *Cranch* v. *White*, 6 *Carr. & Payne*, 767. (25 *Serg. & Lowb.* 641.) the counsel claimed the benefit of the distinction between a prior and present debt. That was trover for a bill drawn on one *Plimpton*, by the plaintiff, and by the plaintiff endorsed, as also by *Boyer* and *Roberts*. The bill was lent to *Boyer*, to raise money upon ; who left it with *Roberts*, a broker, but received no money upon it. The defendant claimed to have received it of *Roberts*, and placed it to his account. *Wilde*, serjt., for the plaintiff, claimed, that the defendant had not given value for it, " and handing it over for an antecedent debt, (he said,) is not endorsing it for value." " If the defendant gave no new consideration, as a ground for the delivery of the bill, it is not valuable." And he submitted it as a point of law. *Tindal*, Ch. J., without taking any notice of this part of the claim, told the jury, that as far as they were concerned, the question was, whether the defendant had any knowledge or notice, or means of knowledge in his power, that the bill was only put into *Roberts*' hand for discount :" " Whether the defendant took the bill *bona fide*, without any notice of the manner in which it had been obtained by *Roberts*." The jury found, that it was not so taken ; which the Chief Justice said, was a verdict for the plaintiff.

In *Bramah* & al. v. *Roberts* & al. 1 *Bing. N. C.* 469. (27 *Serg. & Lowb.* 460.) the endorser brought an action against the acceptor of a bill of exchange. The defendants, under the rule recently established for pleading, pleaded spe-

*Fairfield,*
June, 1836.

Brush
*v.*
Scribner.

cially certain facts, tending to show, that the acceptance was not obligatory. To which the plaintiffs replied a delivery to them of the bill, fairly and *bona fide,* for a good and valuable consideration, that is to say, for moneys advanced, due and owing to them, and denying notice, &c. To this replication there was a special demurrer, shewing, among other causes, that the plaintiffs had not stated whether the moneys were advanced, at the time when the bill was endorsed to them, or whether they had been previously advanced, and were due before the bill was endorsed. The replication, however, was held good; and it was intimated, that a more general allegation would have been good. *Park,* J. says: "If the bill of exchange was endorsed and delivered to the plaintiffs, for a good and valid consideration, that is to say, for money advanced by, and due and owing to, the plaintiffs; and they say, that at the time it was endorsed to them, they had no notice whatever of the fraud, it must be taken that the bill was given *for some antecedent debt.* According to the plain import of the words, it would lead any man to conclude, that *at the time of the endorsement there was a full, fair and bona fide consideration given for this bill of exchange.*" After the opinion of the court had been given upon this demurrer, a motion was made to amend, upon an *affidavit,* shewing, among other things, that when the plaintiffs discounted this bill, they made up the amount by deducting 57*l.* due to them from *Hunt,* from whom they received it, (as the plaintiffs, in this case, deducted 112 dollars, 85 cents, from what they paid *Stevens.*) *Tindal,* Ch. J., after intimating that it was too late to make that defence, says, "these facts only raise an argumentative case: from what I have heard, if I had been a juryman, I should think the discount of this 500*l.* bill *minus* the 57*l.* showed a confidence in the integrity of this transaction rather than any collusion between the plaintiffs and *Hunt;*" and the rule was discharged. 1 *Bing. N. C.* 481. (27 *Serg. & Lowb.* 468.) Upon every principle, if the distinction contended for by the defendant, was recognized, by the *English* courts, the defendant was entitled to have deducted the 57*l.*, the antecedent debt; but that seems to have constituted no part of their defence. This fact seems to have been introduced merely to strengthen the proof of collusion.

Several other cases might be cited, in which it would seem as if the distinction claimed by the defendant must have been recognized, if it existed; and would, if adopted, have saved most of the discussions which ensued. *Haywood* & al. v. *Watson,* 1 *Bing.* 469. (15 *Serg. & Lowb.* 58.) *Bleaden* v. *Charles,* 7 *Bing.* 246. (20 *Serg. & Lowb.* 119.) *Fentum* v. *Pocock,* & al. 5 *Taun.* 192. *Evans* v. *Smith,* 4 *Binn.* 366.

But a case before any of these, will shew how this question was settled, in *Great-Britain,* in the early days of commercial law. *A* gave a bill of exchange, for value received; *B* assigned it to *C,* for an honest debt; *C* brought *indebitatus assumpsit* on this bill against *A,* and had judgment; upon which *A* brought his bill to be relieved in equity against this judgment, because there was really no value received at the giving of this bill, and *C could have no prejudice, who might still resort to B upon his original debt.* It was answered, that it might be relieved against *B,* or any claiming as servant or factor of *A* to the use of *B.* But the chancellor held, that *C, being an honest creditor, and coming by this bill fairly, for the satisfaction of a just debt,* he could not relieve against it, *because it would tend to destroy trade ;* which is carried on, everywhere, by bills of exchange; and he would not lessen an honest creditor's security. *Anon. Com. Rep.* 43. This case, it is true, is anonymous; but it is reported by Ch. B. *Comyns.* It differs, in no material respect, from the present case, except that it was an application in chancery; a court of law having decided upon the claim. There, as here, no consideration passed for the bill; and it was agreed there, as it is here, that as between the original parties, there would have been relief. There, the only consideration paid by the holder, was a prior debt; and the reason given for not relieving, is the same as that given by Lord *Mansfield,* in the cases cited from *Burrow* and *Douglass.* " It would tend to destroy trade, which is conducted every-where, by bills of exchange." Until we find, that this law has been over-ruled, we cannot doubt what is the common law principle.

It has been argued, that in case of an antecedent debt, the credit is not given upon the security taken, as in the case of advancing money or goods, at the time. When a creditor gives up a security, which he then holds, or receives a note or draft in satisfaction or extinguishment of an antecedent debt, it

seems to the court as if he did this upon the credit of the security he then receives ; and in this opinion, they are confirmed, by the view taken of this subject, in a different class of cases, by the supreme court of the *United States.* In *Payson* & al. v. *Coolidge* & al. 2 *Gal.* 233., the defendants having agreed, upon certain terms, to accept a bill of exchange, which might be drawn thereafter, the promisee, upon the faith of this, drew upon the defendants ; and this draft was received, by the plaintiffs, in part payment of the debt then due them ; and they brought this suit against the defendants as acceptors of the draft. *Story,* J. says : "I take it to be clearly settled, that a promise to accept a non-existing bill, if shewn to a third person, who, upon the faith of such promise, receives the draft for a valuable consideration, is, in point of law, an acceptance. There is no foundation for the distinction asserted, by the defendants' counsel, as to receiving such a draft for a pre-existing debt. It is sufficient, that it is received for a fair and valuable consideration, and on the faith of a promise by the drawees to accept it. Although a debt be already due, the party who receives such a draft in part payment, thereby as much gives credit to the drawer and acceptor, as a party who advances his money upon the draft." And in the same case in the supreme court, Ch. J. *Marshall* remarks : "That in all cases, the person who receives such bill in payment of a debt, will be prevented from taking other means to obtain the money due to him." "And the mere circumstance that the bill was taken for a pre-existing debt, had not been thought sufficient to do away the promise to accept." 2 *Wheat.* 66. 73. And in a more recent case, *Story,* J., in giving the opinion of the court, says : "It can make no difference in law, whether the debt for which the bill is taken, is a pre-existing debt, or money then paid for the bill : In each case, there is a substantial credit given, by the party, to the drawer upon the bill ; and the party parts with his present rights at the instance of the promisee." *Townsley* v. *Sumrall,* 2 *Pet.* 170. 182.

These opinions are in entire accordance with what has been understood as the law of this State.

Another objection ought to be noticed. It was said, that as a note or bill, which does not prove productive, does not discharge a previous debt, the receipt of this note had not the effect of discharging the plaintiffs' debt ; and so there was no

valuable consideration. But in this case, it was put to the jury, whether it was received in *satisfaction* and *extinction* of the plaintiffs' debt. Besides, the argument that the debt was not paid, by the receipt of this note, because the plaintiffs' title to the note is invalid, is an assumption of the point in dispute; for unless it is proved that they have no title, the debt is paid; and until that point is established, the plaintiffs can have no remedy, except upon this note.

It is said, however, that the decisions of the state of *New-York* do not conform to these principles; and that this case is to be governed by their laws. The case of *Bay* v. *Coddington* & al. 5 *Johns. Ch. Rep.* 54. was a bill in chancery to compel the defendants to give up certain notes, which they had received from *Randolph & Savage*, upon the eve of their failure. The plaintiff had commissioned *Randolph & Savage* to sell his vessel, and transmit the avails. The sale was made on the 3d of *June;* and *Randolph & Savage* took notes payable to their own order; and on the 12th of *June* stopped payment, and delivered over these notes, with other property, to the defendants, not in payment of a debt, but to secure them for responsibilities they were under for *Randolph & Savage*, and for notes by them lent to *Randolph & Savage*, which were not then due. The plaintiff, after demand, brought this bill to obtain these notes; and Chancellor *Kent* recognizes the rule as laid down by Lord *Mansfield*, but says, the defendants are not holders of that description. "The notes," he said, "were *not negotiated to them, in the usual course of business or trade, nor in payment of any antecedent or existing debt;* nor for cash or property advanced, debt created or responsibility incurred, on the strength and credit of the notes. They were received from *Randolph & Savage*, after they had stopped payment and become insolvent, within the knowledge of the defendants; and were seized upon, by them, as *tabula in naufragio,* to secure themselves against contingent engagements previously made for *Randolph & Savage*, on which they had not then become chargeable. There is no case that entitles such a holder to the paper, in opposition to the title of the true owner. They were not holders for a valuable consideration, within the meaning or policy of the law." He adds, that "it is the credit given to the paper, and the consideration *bona fide* paid on receiving it, that entitles the holder, on grounds of

commercial policy, to such extraordinary protection, even in cases of the most palpable fraud." 3 *Kent Com.* 81.

It is not believed, that this learned judge meant to go abreast of the principles of the cases cited, particularly, when he says, these notes were not negotiated in payment of antecedent debts. He only takes the ground that the case before him was not within those principles. The facts disclosed were sufficient to induce any honest mind to incline strongly against that defence ; nor do we doubt the correctness of that decision. These notes were never paid away, by *Randolph & Savage,* to the defendants, in the ordinary course of business, nor in payment of any antecedent debt. They were handed over, by insolvents, as their last acts, to secure their confidential friends from responsibility, by which they might be subjected. It was the closing scene of the commercial life of those who transferred this paper, and was entirely out of the ordinary course of trade. It was, indeed, *tabula in naufragio.* This case was removed to the supreme court of errors ; and it is true, that in giving their opinions, some judges, whose opinions are entitled to great respect, say, that an antecedent debt is not a valuable consideration within the rule. 20 *Johns. Rep.* 637. If the view we have taken of that case was correct, such an opinion was not necessary for its decision ; and, of course, would not have been conclusive upon the question. The supreme court, and the chancellor, and the superior court of the city of *New-York,* have taken a different view of it ; and held themselves bound, by these opinions, in cases where the transfer has been made in the course of business, *bona fide,* but for an antecedent debt.——That it has been difficult to convince the circuit and other inferior courts of this, is apparent from the number of cases which have gone up ; the result of which, has been, that by a course of decisions, an antecedent debt is not considered as such a valuable consideration as will support the claim of a *bona fide* holder of a negotiable instrument, to the injury of the right of the original parties. *Wardell* & al. v. *Howell,* 9 *Wend.* 170. *Rosa* v. *Brotherson,* 10 *Wend.* 85. *Root* v. *French,* 13 *Wend.* 570. *Payne* v. *Cutler,* 13 *Wend.* 605. *Dickerson* & al. v. *Tillinghast* & al., 4 *Paige's Ch. Rep.* 215. 222. *The Fulton Bank* v. *The Phœnix Bank,* 1 *Hall,* 562.

Whether these decisions will finally receive the sanction of

*Fairfield,*
June, 1836.

**Brush**
*v.*
**Scribner.**

the supreme court of errors, cannot be known. That they have not met the entire approbation of that body, appears by a doubt expressed by *Beardsley,* Senator, in *Driggs* v. *Rockwell,* 11 *Wend.* 509., and by the opinion of *Tracy,* Senator, in the case of *Morton* & al. v. *Rogers* & al. 14 *Wend.*—A material enquiry there was, whether the holder of negotiable paper would be required to prove the consideration for which he obtained it, on the defendants having proved the original consideration fraudulent. The learned senator remarks : " While bills of exchange and promissory notes, of some form, constitute the medium of exchange, the representative of the property of the country, and, in a great measure, its currency, and consequently, the basis of general credit and business, it is natural, and indeed inevitable, that they should often pass from hand to hand, for considerations known only by the parties to the transfer. It would, therefore, greatly impair the confidence in these instruments of trade, and cripple their usefulness, if the holder of them, for a light cause, could have his title impeached, and be required to sustain it, by positive proof of the time, place and circumstances of his acquiring it. As the course of commercial and other business now is, a *bona fide* holder might be involved in serious inconvenience and difficulty to make out the fact ; and would be sometimes defeated of his security, though he had obtained it fairly, in full confidence of the unimpeachable nature with which the law had clothed this species of paper. If to this embarrassment there be added the one arising out of another doctrine, which has recently obtained, and which I am inclined to think no better founded in principle or authority,—I mean the doctrine, that the consideration of a promissory note is impeachable, in the hands of a *bona fide* indorsee, taking it in payment of, or security for, a precedent debt—the two embarrassments together are fitted to produce an important change in the circulation and usefulness of negotiable paper."

Notwithstanding the doubts or opinions of individual members of the supreme court of errors, if this case was to be decided by the laws of *New-York,* and the reports of those cases are to be considered as evidence of them, we should feel bound by these decisions, without anticipating what will be the opinion of a court of dernier resort, however unfortunate it might

be to the plaintiffs that they could not avail themselves of that opinion.

We are then called upon to decide, whether upon the facts before us, this case is to be determined according to the laws of the state of *New-York.* These parties are described as belonging to *New-York;* and from the motion it appears, that the transaction, so far as it respects the plaintiffs, took place in *New-York.* There is, however, nothing in the case, to show, that it was agreed, or proved, upon the trial, what were the laws of that state upon this subject; nor does it appear, that such a question was made below; and it is a well established rule, that the laws of one country or state must be proved, before they can be noticed in another country or state. *Thompson* v. *Ketchum,* 8 *Johns. Rep.* 189. *Holmes* v. *Broughton,* 10 *Wend.* 75. *Brockett* v. *Norton,* 4 *Conn. Rep.* 517. *Hempstead* v. *Reed,* 6 *Conn. Rep.* 486. *Sterling* v. *Plainfield,* 4 *Conn. Rep.* 116.

As the reports of the state of *New-York* have been adverted to, by the counsel for the parties throughout the trial, as the evidence of the law of that state, perhaps the court might fairly say, that the parties had consented to admit them as evidence of the law of that state, if it appeared upon this motion, that the case was placed upon the ground of those laws. But it is not stated, that the question whether this case was to be governed by the laws of *New-York* was ever raised in the court below, and the judge who presided, informs us, that it was not in fact made, although these decisions were alluded to, as evidence of the common law. Now, our rule is, that the precise point made by the party, and the precise opinion expressed by the court, shall appear upon the motion. 6 *Conn. Rep.* 327. If then, we were to grant a new trial, it would not be because the charge was incorrect upon the points presented, but because there was an omission to present certain points—the very thing the rule was designed to guard against, as we have repeatedly decided. *Davidson* v. *Bridgeport,* 8 *Conn. Rep.* 476. *Torrey* v. *Holmes,* 10 *Conn. Rep.* 499. And this is in accordance with the practice in *Westminster-Hall. Chesterman* v. *Lamb,* 2 *Adol. & Ellis,* 129. *Moore* v. *Eddowes,* 2 *Adol. & Ellis,* 133. (29 *Serg. & Lowb.* 48. 50.) In the case of *Crandall* v. *The State,* 10 *Conn. Rep.* 340., we did reverse a judgment upon a point not made below. That, however,

*Fairfield,*
*June, 1836.*

Brush
*v.*
Scribner.

was a criminal case, and upon a writ of error ; and a majority of the court were of opinion, that in such a case they could not say there was in the record no error, when the error was manifest upon inspection. And it is well known, that upon writs of error we are bound by technical rules, which do not prevail upon motions for new trial. Believing that justice has been done, in this case, we do not feel it to be our duty to open it for the purpose of permitting the party to present a new question, upon which no opinion was asked or given.

In this opinion the other Judges concurred.

New trial not to be granted.