### RAILROAD COMPANY *v.* NATIONAL BANK.

1. The judgment in an action brought by the holder of negotiable paper against the indorsers, is not a bar to his subsequent action against the maker, who was not notified of the pendency of the first action.
2. An estoppel by judgment is equally conclusive upon all the parties to the action and their privies, and may not be invoked or repudiated at the pleasure of one of them as his interest may require.
3. The transfer by indorsement to a creditor of negotiable paper before maturity, merely as security for an antecedent debt, although it is without his express agreement for indulgence, is not an improper use of such paper, and is as much in the usual course of commercial business as its transfer in payment of the debt. In neither case is the *bona fide* holder affected by equities or defences between prior parties of which he had no notice.
4. The courts of the United States are not controlled by the decisions of State courts on questions of general commercial law. *Swift* v. *Tyson* (16 Pet. 1) and *Oates* v. *National Bank* (100 U. S. 239) reaffirmed.

ERROR to the Circuit Court of the United States for the Southern District of New York.

This was an action by The National Bank of the Repub-
lic of New York against The Brooklyn City and Newtown
Railroad Company.

The case, as made by an agreed statement of facts, is this:—

The company, a corporation organized under the laws of
New York, executed, at Brooklyn, in that State, May 9, 1873,
its promissory note for the sum of $5,000, payable four months
after date to the order of William V. LeCount, its treasurer,
at the Atlantic State Bank of Brooklyn. It was indorsed in
blank, first by him, and then by Palmer & Co., a firm com-
posed of Thomas Palmer, Jr., and Anson S. Palmer, the for-
mer being the president and the latter the financial agent of
the company, and together owning the larger portion of its
stock. It was made for the purpose only of raising money
thereon for the company. Neither LeCount nor Palmer & Co.

received any consideration for their respective indorsements. The note thus indorsed was, with others, placed by the company in the hands of Hutchinson & Ingersoll, a firm of note-brokers in Wall Street, for negotiation and sale.

Prior to the execution of the note Hutchinson & Ingersoll had frequently borrowed money from the bank. They, however, kept no account, and had no transactions with it, other than those to which reference will now be made.

In the month of October, 1872, the bank first made them a call loan at seven per cent interest, of $25,000, on collaterals. Subsequently, in 1873, it made to them other call loans on collaterals, at the same rate of interest, as follows: March 11, $15,000; March 15, $10,000; April 11, $10,000; May 16, $10,000; May 20, $20,000; May 23, $10,000; June 4, $15,000; June 6, $12,000; June 12, $10,000; June 19, $36,000; and July 11, $10,000. Each of these loans was a separate one, upon a particular and distinct lot of collaterals. Hutchinson & Ingersoll were in the habit of borrowing money from various banks and from individuals or firms upon specific lots of collaterals.

The loan of $36,000 on 19th June, 1873, was upon several notes as collateral security; among them the above-described note for $5,000, executed May 9, 1873. All the loans by the bank, prior to the one of $36,000, had been paid off before that loan was made.

The loan of $10,000 on 11th July, 1873, was upon the following notes as collateral security: Two notes of Howes, Hyatt, & Co. for $2,605.98 and $3,540.15, and two of H. L. Ritch & Co. for $3,320.17 and $2,146.92.

On the 22d of July, 1873, Howes, Hyatt, & Co. having become insolvent, Hutchinson & Ingersoll executed and delivered to the bank, at its request, antedated to June 19, 1873 (which was the date of the $36,000 loan), a written instrument, whereby they agreed with the bank "that all securities, bonds, stocks, things in action, or other property or evidences of property whatsoever, which have been or may at any time hereafter be deposited or left by us or on our account, with said bank, whether specifically pledged or not, may be held by said bank, and shall be deemed to be and are hereby pledged

as security for the payment of any and every indebtedness, liability, or engagement on our part, held by said bank, and that on the non-payment, when due and payable, of any sum or sums of money which have been or may hereafter be by said bank lent, paid, or advanced to or for the account or use of us, or for which we are or may become in any way liable or indebted to said bank, the said bank, or its president or cashier, may immediately thereupon, or at any time thereafter, sell, &c., . . . and apply the net proceeds of sale to the payment of any sum or sums due and payable from us to said bank, and hold any surplus of such net proceeds, together with any and all remaining securities, property or evidences of property, then held by said bank and not sold, as security for the payment of any and all other of our then existing and remaining liabilities and engagements to said bank."

When that writing was executed, no agreement was made to extend the loan, or to refrain from calling it in.

The bank knew that Hutchinson & Ingersoll were note-brokers, but until Aug. 8, 1873, had no knowledge or information of the connection of the Palmers with the railroad company, or of the circumstances attending the making or indorsement of the note in suit, or of the purpose thereof, or of any relations, dealings, or communication between Hutchinson & Ingersoll, and the parties to the note (except that they knew Hutchinson & Ingersoll to be note-brokers), or that the note was anything else than ordinary business paper, or that there was any question as to the right of said Hutchinson & Ingersoll to pledge or negotiate it. Nor did the railroad company know or suspect that the firm had parted with or hypothe 'ed said note until Aug. 15, 1873.

The company, by reason of certain advances made to its use, by Hutchinson & Ingersoll, became indebted to the latter, on the 8th of August, 1873, in the sum of $600. On the fifteenth day of August, 1873, it tendered that sum to the firm, and demanded a return of the $5,000 note. During the same month it made a like tender to the bank, and demanded the note.

The $36,000 loan was paid in full out of the collaterals given to secure its payment, as they respectively matured, without resorting to the note in suit, the first payment of $4,580 being

July 22, 1873, and the last payment being April 4, 1874, leaving the $5,000 note in the bank's possession.

Hutchinson & Ingersoll are insolvent. The collaterals collected exceeded the $36,000 loan by $2,403.61.

On the $10,000 loan of July 11, 1873, there was a balance due the bank, Nov. 21, 1876, of $5,136.68 after exhausting all collaterals in its possession which had been specially pledged to secure that loan, and crediting the amount, with interest collected, of a certain judgment to be now referred to.

In 1874, the bank sued Palmer & Co., as indorsers upon the note in suit, in the Supreme Court of New York. The case was sent to a referee, who rendered judgment in favor of the bank for $601, which seems to be the amount due from the railroad company to Hutchinson & Ingersoll. That judgment, with the costs, was satisfied.

The present action is by the bank against the railroad company to recover the amount of the $5,000 note executed by the latter on the 9th of May, 1873, and placed in the hands of Hutchinson & Ingersoll for sale for the benefit of the company. It was agreed that, if the company is liable to the bank upon that note, the amount would be as of Nov. 21, 1876, $5,136.68.

The court below gave judgment for the bank, and the company sued out this writ.

*Mr. William Dorsheimer* for the plaintiff in error.

The matter is *res judicata*, for there was a determination, by the Supreme Court of New York, upon the same subject-matter in a controversy between the same parties or their privies. It is true that the defendants there were not the makers of the note. Although makers and indorsers may have independent interests, yet they, in this instance, are privies. The note never had any valid inception. The making and indorsing were alike without consideration. Neither the maker nor the indorsers could incur any liability on the note, except such as might arise from the unauthorized action of Hutchinson & Ingersoll in pledging it to the bank.

The term " privies " is not confined to persons interested in real estate (3 Tomlin, Law Dict. 218; 2 Bouv. 382), nor is it true that only the same parties, *eo nomine*, are bound by a judgment. *Green* v. *Clark*, 5 Den. (N. Y.) 497; s. c. 13 Barb.

(N. Y.) 57 ; *Kent* v. *Hudson River Railroad Co.*, 22 id. 278 ; *Taylor* v. *Spader*, 48 N. Y. 664. The expression " parties " is not confined to the parties to the record. It includes all those who have a direct interest in the subject-matter of the suit. *Bates* v. *Stanton*, 1 Duer (N. Y.), 87 ; *Ehle* v. *Bingham*, 7 Barb. (N. Y.) 494.

Even if the judgment be not construed as *res judicata*, in the strict sense, the bank is estopped from proceeding further with this action. It selected its own tribunal, abided by the judgment there rendered, and entered satisfaction of it, after accepting the money which the court determined to be the whole amount due upon the note. The claim was extinguished by that acceptance and satisfaction. *Woodworth* v. *Spofford*, 2 McLean, 168 ; *Sedam* v. *Williams*, 4 id. 51 ; *King* v. *Hoare*, 13 Mees. & W. 449 ; *Farrell* v. *Hibbard*, 3 N. H. 318.

This case was tried upon similar pleadings, and the same state of facts as that, with the single exception of the paper signed July 22, 1873, which would not have varied the result there, and in no way strengthens the case here. It was signed long after both loans had been made, was without consideration, and no action was taken upon it. The bank did not agree to extend the loan, nor did it refrain from calling it in. It must be conceded that, under the adjudications in New York, the bank was not in that case entitled to recover more than the sum awarded, unless it had a lien upon all the securities of Hutchinson & Ingersoll, which was termed in the decision a " banker's lien." Its relations with them were not those of banker and customer, and such a lien could not, therefore, attach. They were not depositors or dealers with the plaintiff, and kept no account there. In the cases where the question of such a lien has arisen, the party asserting it was a banker *quoad* the person from whom the security had been acquired. In some of them, the lien was claimed under special circumstances, as on a pledge, but no *banker's* lien can arise, unless the relation of banker and customer exists. The banker in England is the general financial agent of the customer. Even there the lien would not apply to a case like this, though the parties did actually occupy the legal relation of banker and customer. *Davis* v. *Bowsher*, 5 T. R. 488 ; *Brandas* v. *Barnett*,

12 Cl. & Fin. 787; *Jones* v. *Peppercorn*, 1 John. 430 , *Bolland* v. *Bygrave*, 1 Ry. & M. 271 ; *In re European Bank*, *Agra Bank Claim*, Law Rep. 8 Ch. 41.

Outside of the question as to the asserted specified lien of a " banker " the plaintiff cannot recover.   *Ocean Bank* v. *Scott*, 23 N. Y. 293; *Clarke* v. *Lawrence*, 36 id. 118; *McBride* v. *Farmers' Bank*, 26 id. 450 ;  s. c. 25 Barb. (N. Y.) 657 ; *Van Namee* v. *Bank of Troy*,  8 id. 312 ; *West* v. *American Exchange Bank*, 44 id. 175; *American Exchange Bank* v. *Corlies*, 46 id. 19; *Farrington* v. *Franklin Bank*, 24 id. 559; *Neponset Bank* v. *Leland*, 5 Metc. (Mass.) 259; Story, Agency, sect. 381 ; *Commercial Bank* v. *Marine Bank*, 3 Keyes (N. Y.), 337; *Bay* v. *Coddington*, 5 Johns. (N. Y.) Ch. 54; s. c. 20 Johns. (N. Y.) 637.

These decisions all affirm this doctrine, and it may be now considered as the settled law of the State of New York.

The plaintiff relied upon *Swift* v. *Tyson*, 16 Pet. 1.

1. An examination of that case will show that the acceptance sued upon was, with another, transferred *in payment of* a promissory note, which *was given up* when they were received.   All that was there decided is, that an innocent third party may acquire a title to a note if he takes it in *payment of* a pre-existing debt, as well as if he makes an immediate advance upon it.

2. But conceding, for the purposes of the argument, that a party receiving a note as additional security to an existing claim takes it free from the equities between antecedent parties, this is not such a case.   The note was given as such security for a loan, which has been since paid.   The right of recovery cannot extend to a subsequent and independent loan made upon different collaterals.

3. The cases in the English books relied upon below were those of continuing loans or balances.   In other words, the party holding the notes had done, or omitted to do, some act on the faith thereof.

Here there was no agreement to extend the second loan.

An examination of *Swift* v. *Tyson* shows that the point was taken on the argument that " the acceptance of the bill of exchange by the defendant having been given in New York, the contract was to be regulated by the laws of that State."   The

reporter says: "This question was not brought before the court by the certificate of division."

In the case at bar the question is clearly presented. Inasmuch as these parties are both residents of New York, and the contract was made there, and the plaintiff resorted to her tribunals for the assertion of its rights, and obtained a judgment upon which it received payment, and gave satisfaction, the case should be determined by the *lex loci contractus;* and this court, it is submitted, should accept the decisions of the courts of that State as governing this case.

Mr. *Thomas H. Rodman*, contra.

The doctrine in *Swift* v. *Tyson.* (16 Pet. 1) is explicit and decisive in favor of the plaintiff. It was reaffirmed and enforced in *McCarty* v. *Roots* (21 How. 432), and has been adopted and applied in the State courts. *Quinn* v. *Hard*, 43 Vt. 375; *Russell* v. *Splater*, 47 id. 273; *Atkinson* v. *Brooks*, 26 id. 569; *Fisher* v. *Fisher*, 98 Mass. 303; *Stoddard* v. *Kimball*, 6 Cush. (Mass.) 469; *Roberts* v. *Hall*, 37 Conn. 205; *Bank of Republic* v. *Carrington*, 5 R. I. 515; *Williams* v. *Little*, 11 N. H. 66; *Bowman* v. *Millison*, 58 Ill. 36; *Manning* v. *McClure*, 36 id. 490; *Payne* v. *Bensley*, 8 Cal. 260; *Giovanovich* v. *Citizens' Bank*, 26 La. Ann. 15; *Smith* v. *Isaacs*, 23 id. 454; *Allaire* v. *Hartshorne*, 21 N. J. L. 665; *Armour* v. *McMichael*, 36 id. 92; *Maitland* v. *Citizens' National Bank of Baltimore*, 40 Md. 540; *Robins* v. *Lair*, 31 Iowa, 9; *Bonaud* v. *Genesi*, 42 Ga. 639.

If the pledge of June 19, 1873, had not been made, the plaintiff, organized and doing business as a national banking association, would have had the right to hold the note in suit for the deficiency on the second loan. Hutchinson & Ingersoll were in the habit of borrowing money of the plaintiff on collaterals. A banker has a lien for a general balance (*In re European Bank, Agra Bank Claim*, Law Rep. 8 Ch. 41), and it is not excluded by a special contract, unless the latter be inconsistent therewith.

The defence of a former recovery is not tenable. The judgment was not rendered in a suit between the same parties, and there is no privity between maker and indorser to which the doctrine of estoppel applies. Bigelow, Estoppel, 75. A judgment against the indorser of a note does not discharge the maker.

*Russell & Erwin Manuf. Co.* v. *Carpenter*, 5 Hun (N. Y.), 162;
*Pritchard* v. *Hitchcock*, 6 Man. & G. 151.

The plaintiff's claim was not satisfied by the payment of the
judgment against the indorsers for a part of the debt. Part
payment by, and release of, the indorser does not discharge the
maker. Story, Promissory Notes, sect. 422, note 2; *Commercial
Bank* v. *Cunningham*, 24 Pick. (Mass.) 270.


MR. JUSTICE HARLAN, after stating the facts, delivered the
opinion of the court.

The first proposition of the plaintiff in error is that there has
been a final determination by a court of competent jurisdiction,
between the same parties or their privies, upon the same subject-
matter as that here in controversy. This contention rests upon
the judgment of the Supreme Court of New York, in the action
instituted by the bank against Palmer & Co., as the indorsers
of the note in suit.

The judgment in the State court clearly constitutes no bar to
the present action. Personal judgments bind only parties and
their privies. The railroad company was not a party to the
separate action against Palmer & Co., nor did it receive notice
from the latter of the pendency of that suit. It was, therefore,
in no manner affected by the judgment. Had the company
received such notice in due time, it would, perhaps, although
not technically a party to the record, have been estopped, at
least as between it and its accommodation indorsers, from say-
ing that the latter were not bound to pay the judgment, if
obtained without fraud or collusion. Being, however, an entire
stranger to the record, it had no opportunity or right, in that
proceeding, to controvert the claim of the bank, to control the
defence, to introduce or cross-examine witnesses, or to prosecute
a writ of error to the judgment.

If, in the action against Palmer & Co., the bank had obtained
judgment for the full amount of the note, and, being unable to
collect it, had sued the railroad company, the latter would not
have been precluded by the judgment in that action, to which
it was not a party, and of the pendency of which it had not been
notified, from asserting any defence it might have against the
note. This being so, it results that the company cannot plead

the judgment in the State court as a bar to this action. An estoppel, arising out of the judgment of a court of competent jurisdiction, is equally conclusive upon all the parties to the action and their privies. It may not be invoked or repudiated at the pleasure of one of the parties, as his interest may happen to require.

The liability of the maker and indorsers was not joint, but several, and, therefore, a judgment in an action against the indorsers, upon the contract of indorsement, could not bar a separate action by the bank against the maker, — certainly not. where the maker was without notice from the indorsers of the pendency of the action against them.

The next proposition involves the right of the railroad company to show, as against the bank, that the note was executed and delivered to Hutchinson & Ingersoll for the purpose only of raising money upon it for the company, and that, consequently, they had no authority to pledge it as collateral security for their own indebtedness to the bank. It will have been observed, from the statement of facts, that the note in suit was among those pledged to the bank as security for the call loan of $36,000, made June 19, 1873 ; that Howes, Hyatt, & Co., whose notes had been pledged as security for the call loan of $10,000, made June 19, 1873, having become insolvent, Hutchinson & Ingersoll, July 22, 1873, at the request of the bank, executed the writing, dated June 19, 1873, whereby they pledged all securities, bonds, stocks, things in action, or other property theretofore deposited with the bank, whether specifically or not, as security for the payment of any and every indebtedness, liability, or engagement held by the bank, for which they were, or should become, in any way liable. Although, therefore, the call loan of $36,000 was extinguished, without resorting to the note in suit, that note, under the agreement made July 22, 1873, stood pledged as collateral security, also, for the $10,000 call loan of July 11, 1873.

The bank, we have seen, received the note, before its maturity, indorsed in blank, without any express agreement to give time, but without notice that it was other than ordinary business paper, or that there was any defence thereto, and in ignorance of the purposes for which it had been executed and

delivered to Hutchinson & Ingersoll. Did the bank, under these circumstances, become a holder for value, and as such entitled, according to the recognized principles of commercial law, to be protected against the equities or defences which the railroad company may have against the other parties to the note?

This question was carefully considered, though, perhaps, it was not absolutely necessary to be determined, in *Swift* v. *Tyson*, 16 Pet. 1. After stating that the law respecting negotiable instruments was not the law of a single country only, but of the commercial world, the court, speaking by Mr. Justice Story, said: " And we have no hesitation in saying that a pre-existing debt does constitute a valuable consideration in the sense of the general rule already stated as applicable to negotiable instruments. Assuming it to be true (which, however, may well admit of some doubt from the generality of the language) that the holder of a negotiable instrument is unaffected with the equities between antecedent parties, of which he has no notice, only where he receives it in the usual course of trade and business for a valuable consideration, before it becomes due, we are prepared to say that receiving it in payment of or *as security for a pre-existing debt* is according to the known usual course of trade and business. And why, upon principle," continued the court, " should not a pre-existing debt be deemed such a valuable consideration? It is for the benefit and convenience of the commercial world to give as wide an extent as practicable to the credit and circulation of negotiable paper, that it may pass not only as security for new purchases and advances, made upon the transfer thereof, but also in payment of and as security for pre-existing debts. The creditor is thereby enabled to realize or to secure his debt, and thus may safely give a prolonged credit, or forbear from taking any legal steps to enforce his rights. The debtor, also, has the advantage of making his negotiable securities of equivalent value to cash. But establish the opposite conclusion, that negotiable paper cannot be applied in payment of or as security for pre-existing debts, without letting in all the equities between the original and antecedent parties, and the value and circulation of such securities must be essentially diminished, and the debtor driven to the embarrass-

ment of making a sale thereof, often at a ruinous discount, to some third person, and then by circuity to apply the proceeds to the payment of his debts. What, indeed, upon such a doctrine would become of that large class of cases where new notes are given by the same or by other parties, by way of renewal or security to banks, in lieu of old securities discounted by them which have arrived at maturity? Probably more than one-half of all bank transactions in our country, as well as those of other countries, are of this nature. The doctrine would strike a fatal blow at all discounts of negotiable securities for pre-existing debts."

After a review of the English cases, the court proceeded: "They directly establish that a *bona fide* holder, taking a negotiable note in payment of *or* as security for a pre-existing debt, is a holder for a valuable consideration, entitled to protection against all the equities between the antecedent parties."

The opinion in that case has been the subject of criticism in some courts, because it seemed to go beyond the precise point necessary to be decided, when declaring that the *bona fide* holder of a negotiable note, taken as collateral security for an antecedent debt, was protected against equities existing between the original or antecedent parties. The brief dissent of Mr. Justice Catron was solely upon that ground, which renders it quite certain that the whole court was aware of the extent to which the opinion carried the doctrines of the commercial law upon the subject of negotiable instruments transferred or delivered as security for antecedent indebtedness. In the judgment of this court, as then constituted (Mr. Justice Catron alone excepted), the holder of a negotiable instrument, received before maturity, and without notice of any defence thereto, is unaffected by the equities or defences of antecedent parties, equally whether the note is taken as collateral security for or in payment of previous indebtedness. And we understand the case of *McCarty* v. *Roots* (21 How. 432), to affirm *Swift* v. *Tyson*, upon the point now under consideration. It was there said: "Nor does the fact that the bills were assigned to the plaintiff as collateral security for a pre-existing debt impair the plaintiff's right to recover." p. 438. "The delivery of the

bills to the plaintiff as collateral security for a pre-existing debt, under the decision of *Swift* v. *Tyson*, was legal." p. 439.

It may be remarked in this connection that the courts holding a different rule have uniformly referred to an opinion of Chancellor Kent in *Bay* v. *Coddington* (5 Johns. (N. Y.) Ch. 54), reaffirmed in *Coddington* v. *Bay*, 20 Johns. (N. Y.) 637. There is, however, some reason to believe that the views of that eminent jurist were subsequently modified. In the later editions of his Commentaries (vol. iii. p. 81, note *b*), prepared by himself, reference is made to *Stalker* v. *McDonald* (6 Hill (N. Y.), 93), in which the principles asserted in *Bay* v. *Coddington* were re-examined and maintained in an elaborate opinion by Chancellor Walworth, who took occasion to say that the opinion in *Swift* v. *Tyson* was not correct in declaring that a pre-existing debt was, of itself, and without other circumstances, a sufficient consideration to entitle the *bona fide* holder, without notice, to recover on the note, when it might not, as between the original parties, be valid. But Chancellor Kent adds: " Mr. Justice Story, on Promissory Notes, p. 215, note 1, repeats and sustains the decision in *Swift* v. *Tyson*, and I am inclined to concur in that decision as the plainer and better doctrine." Of course it did not escape his attention that the court in *Swift* v. *Tyson* declared the equities of prior parties to be shut out as well when the note was merely pledged as collateral security for a pre-existing debt, as when transferred in payment or extinguishment of such debt.

According to the very general concurrence of judicial authority in this country as well as elsewhere, it may be regarded as settled in commercial jurisprudence — there being no statutory regulations to the contrary — that where negotiable paper is received in payment of an antecedent debt; or where it is transferred, by indorsement, as collateral security for a debt created, or a purchase made, at the time of transfer; or the transfer is to secure a debt, not due, under an agreement express or to be clearly implied from the circumstances, that the collection of the principal debt is to be postponed or delayed until the collateral matured ; or where time is agreed to be given and is actually given upon a debt overdue, in consideration of the transfer of negotiable paper as collateral security

therefor ; or where the transferred note takes the place of other paper previously pledged as collateral security for a debt, either at the time such debt was contracted or before it became due, —in each of these cases the holder who takes the transferred paper, before its maturity, and without notice, actual or otherwise, of any defence thereto, is held to have received it in due course of business, and, in the sense of the commercial law, becomes a holder for value, entitled to enforce payment, without regard to any equity or defence which exists between prior parties to such paper.

Upon these propositions there seems at this day to be no substantial conflict of authority. But there is such conflict where the note is transferred as collateral security *merely*, without other circumstances, for a debt previously created. One of the grounds upon which some courts of high authority refuse, in such cases, to apply the rule announced in *Swift* v. *Tyson* is, that transactions of that kind are not in the usual and ordinary course of commercial dealings. But this objection is not sustained by the recognized usages of the commercial world, nor, as we think, by sound reason. The transfer of negotiable paper as security for antecedent debts constitutes a material and an increasing portion of the commerce of the country. Such transactions have become very common in financial circles. They have grown out of the necessities of business, and, in these days of great commercial activity, they contribute largely to the benefit and convenience both of debtors and creditors. Mr. Parsons, in his treatise on the Law of Promissory Notes and Bills of Exchange, discusses the general question of the transfer of negotiable paper under three aspects, — one, where the paper is received as collateral security for antecedent debts. We concur with the author, "that, when the principles of the law merchant have established more firmly and unreservedly their control and their protection over the instruments of the merchant, all of these transfers (not affected by peculiar circumstances) will be held to be regular, and to rest upon a valid consideration." 1 Parsons, Notes and Bills (2d ed.), 218.

Another ground upon which some courts have declined to sanction the rule announced in *Swift* v. *Tyson* is, that upon the

transfer of negotiable paper merely as collateral security for an antecedent debt nothing is surrendered by the indorsee, — that to permit the equities between prior parties to prevail deprives him of no right or advantage enjoyed at the time of transfer, imposes upon him no additional burdens. and subjects him to no additional inconveniences.

This may be true in some, but it is not true in most cases, nor, in our opinion, is it ever true when the note, upon its delivery to the transferee, is in such form as to make him a party to the instrument, and impose upon him the duties which, according to the commercial law, must be discharged by the holder of negotiable paper in order to fix liability upon the indorser.

The bank did not take the note in suit as a mere agent to receive the amount due when it suited the convenience of the debtor to make payment. It received the note under an obligation imposed by the commercial law, to present it for payment, and give notice of non-payment, in the mode prescribed by the settled rules of that law. We are of opinion that the undertaking of the bank to fix the liability of prior parties, by due presentation for payment and due notice in case of non-payment, — an undertaking necessarily implied by becoming a party to the instrument, — was a sufficient consideration to protect it against equities existing between the other parties, of which it had no notice. It assumed the duties and responsibilities of a holder for value, and should have the rights and privileges pertaining to that position. The correctness of this rule is apparent in cases like the one now before us. The note in suit was negotiable in form, and was delivered by the maker for the purpose of being negotiated. Had it been regularly discounted by the bank, at any time before maturity, and the proceeds either placed to the credit of Hutchinson & Ingersoll, or applied directly to the discharge, *pro tanto*, of any one of the call loans previously made to them, it would not be doubted that the bank would be protected against the equities of prior parties. Instead of procuring its formal discount, Hutchinson & Ingersoll used it to secure the ultimate payment of their own debt to the bank. At the time the written agreement of July 22, 1873, was executed, by which this note, with others,

was pledged as security for any debt then or thereafter held against them; the bank had the right to call in the $10,000 loan, that is, to require immediate payment. The securities upon which that loan rested had become, in part, worthless, and it is evident that but for the deposit of additional collateral securities the bank would have called in the loan, or resorted to its rightful legal remedies for the enforcement of payment. It was, under the circumstances, the duty of the debtors to make such payment, or to secure the debt. It was important to them, and was in the usual course of commercial transactions, to furnish such security. If the bank was deceived as to the real ownership of the paper, or as to the purposes of its execution and delivery to Hutchinson & Ingersoll, it was because the railroad company intrusted it to those parties in a form which indicated that the latter were its rightful holders and owners, with absolute power to dispose of it for any purpose they saw proper.

Our conclusion, therefore, is that the transfer, before maturity, of negotiable paper, as security for an antecedent debt merely, without other circumstances, if the paper be so indorsed that the holder becomes a party to the instrument, although the transfer is without express agreement by the creditor for indulgence, is not an improper use of such paper, and is as much in the usual course of commercial business as its transfer in payment of such debt. In either case, the *bona fide* holder is unaffected by equities or defences between prior parties, of which he had no notice. This conclusion is abundantly sustained by authority. A different determination by this court would, we apprehend, greatly surprise both the legal profession and the commercial world. See Bigelow's Bills and Notes, 502 *et seq.*; 1 Daniel, Neg. Inst. (2d ed.) c. 25, sects. 820–833; Story, Promissory Notes, sects. 186, 195 (7th ed.), by Thorndyke; 1 Parsons, Notes and Bills (2d ed.), 218, sect. 4, c. 6; and Redfield & Bigelow's Leading Cases upon Bills of Exchange and Promissory Notes, where the authorities are cited by the authors.

It is, however, insisted that, by the course of judicial decision in New York, negotiable paper transferred merely as collateral security for an antecedent debt, is subject to the equities

of prior parties existing at the time of transfer.; that the bank being located in New York, and the other parties being citizens of the same State, and the contract having been there made, this court is bound to accept and follow the decision of the State court, whether it meets our approval or not. This contention rests upon the provision of the statute which declares that " the laws of the several States, except where the Constitution, treaties, or statutes of the United States otherwise require or provide, shall be regarded as rules of decision in trials at common law, in the courts of the United States, in cases where they apply."

It is undoubtedly true that if we should apply to this case the principles announced in the highest court of the State of New York, a different conclusion would have been reached from that already announced. That learned court has held that the holder of negotiable paper transferred *merely* as collateral security for an antecedent debt, nothing more, is not a holder for value, within those rules of commercial law which protect such paper against the equities of prior parties.

The question here presented is concluded by our former decisions.

We remark, at the outset, that the section of the statute of the United States already quoted is the same as the thirty-fourth section of the original Judiciary Act.

In *Swift* v. *Tyson* (*supra*), the contention was that this court was obliged to follow the decisions of the State courts in all cases where they apply. But this court said: " In order to maintain the argument, it is essential, therefore, to hold that the word ' laws ' in this section includes within the scope of its meaning the decisions of the local tribunals. In the ordinary use of language it will hardly be contended that the decisions of courts constitute laws. They are, at most, only evidence of what the laws are, and are not of themselves laws. They are often re-examined, reversed, and qualified by the courts themselves, whenever they are found to be either defective, or ill-founded, or otherwise incorrect. The laws of a State are more usually understood to mean the rules and enactments promulgated by the legislative authority thereof, or long-established local customs having the force of laws. In all the vari-

ous cases which have hitherto come before us for decision this court have uniformly supposed that the true interpretation of the thirty-fourth section limited its application to State laws strictly local; that is to say, to the positive statutes of the State, and the construction thereof adopted by the local tribunals, and to rights and titles to things having a permanent locality, such as the rights and titles to real estate, and other matters immovable and intra-territorial in their nature and character. It has never been supposed by us that the section did apply, or was designed to apply, to questions of a more general nature, not at all dependent upon local statutes or local usages of a fixed and permanent operation : as, for example, to the construction of ordinary contracts or other written instruments, and especially to questions of general commercial law, where the State tribunals are called upon to perform the like functions as ourselves; that is, to ascertain upon general reasoning and legal analogies what is the true exposition of the contract or instrument, or what is the just rule furnished by the principles of commercial law to govern the case. And we have not now the slightest difficulty in holding that this section, upon its true intendment and construction, is strictly limited to local statutes and local usages of the character before stated, and does not extend to contracts and other instruments of a commerial nature, the true interpretation and effect whereof are to be sought, not in the decisions of the local tribunals, but in the general principles and doctrines of commercial jurisprudence. Undoubtedly, the decisions of the local tribunals upon such subjects are entitled to and will receive the most deliberate attention and respect of this court; but they cannot furnish positive rules, or conclusive authority, by which our own judgments are to be bound up and governed."

In *Carpenter* v. *The Providence Washington Insurance Co.* (16 Pet. 495), decided at the same term with *Swift* v. *Tyson*, it was necessary to determine certain questions in the law of insurance. The court said: " The questions under our consideration are questions of general commercial law, and depend upon the construction of a contract of insurance which is by no means local in its character, or regulated by any local policy or customs. Whatever respect, therefore, the decisions of State

tribunals may have on such a subject, and they certainly are entitled to great respect, they cannot conclude the judgment of this court.   On the contrary, we are bound to interpret this instrument according to our own opinion of its true intent and objects, aided by all the lights which can be obtained from all external sources whatsoever; and if the result to which we have arrived differs from these learned State courts, we may regret it, but it cannot be permitted to alter our judgment." ·

In *Oates* v. *National Bank* (100 U. S. 239), we had before us the precise question now under consideration.   That was an action by a national bank, located in Alabama, against a citizen of that State, upon a promissory note there executed and nego-tiated.   It was contended that the decision of the Supreme Court of Alabama should be accepted as the law governing the rights of parties.   We, however, held — referring to some of our previous decisions — that the Federal courts were not bound by the decisions of the State courts " upon questions of general commercial law. . . . We have already seen that the statutes of Alabama placed under the protection of the commercial law promissory notes payable in money at a certain designated place; but how far the rights of parties here are affected by the rules and doctrines of that law is for the Federal courts to determine, upon their own judgment as to what these rules and doctrines are."

To this doctrine, which received the approval of all the members of this court when first announced, we have, as our decisions show, steadily adhered.   We perceive no reason for its modification in any degree whatever   We could not infringe upon it, in this case, without disturbing or endangering that stability which is essential to be maintained in the rules of commercial law.   The decisions of the New York court, which we are asked to follow in determining the rights of parties under a contract there made, are not in exposition of any legis-lative enactment of that State.   They express the opinion of that court, not as to the rights of parties under any law local to that State, but as to their rights under the general commer-cial law existing throughout the Union, except where it may have been modified or changed by some local statute.   It is a law not peculiar to one State, or dependent upon local author-

ity, but one arising out of the usages of the commercial world. Suppose a State court, in a case before it, should determine what were the laws of war as applicable to that and similar cases. The Federal courts, sitting in that State, possessing, it must be conceded, equal power with the State court in the determination of such questions, must, upon the theory of counsel for the plaintiff in error, accept the conclusions of the State court as the true interpretation, for that locality, of the laws of war, and as the "law" of the State in the sense of the statute which makes the "laws of the States rules of decision in trials at common law." We apprehend, however, that no one would go that far in asserting the binding force of State decisions upon the courts of the United States when the latter are required, in the discharge of their judicial functions, to consider questions of general law, arising in suits to which their jurisdiction extends. To so hold would be to defeat one of the objects for which those courts were established, and introduce infinite confusion in their decisions of such questions. Further elaboration would seem to be unnecessary.

*Judgment affirmed.*

MR. JUSTICE MILLER and MR. JUSTICE FIELD dissented.

MR. JUSTICE CLIFFORD and MR. JUSTICE BRADLEY, concurring in the judgment, delivered the following opinions: —

MR. JUSTICE CLIFFORD. Commercial law is a system of jurisprudence acknowledged by all maritime nations; and upon no subject is it of more importance that there should be, as far as practicable, uniformity of decision throughout the world.

Bills of exchange and promissory notes are commercial paper in the strictest sense, and as such must ever be regarded as favored instruments, as well on account of their negotiable quality, as their universal convenience in mercantile affairs. Everywhere the rule is that they may be transferred by indorsement, or when indorsed in blank or made payable to bearer they are transferable by mere delivery. International regulations encourage their use as a safe and convenient medium for the settlement of balances among mercantile men

of different nations, and any course of judicial decision calculated to restrain or impede their full and unembarrassed circulation for the purposes of foreign or domestic trade would be contrary to the soundest principles of public policy. *Goodman* v. *Simonds*, 20 How. 343, 364.

Sufficient appears to show that the corporation plaintiff became the holder of the note described in the declaration, and that, payment being refused, it instituted the present action of assumpsit to recover the amount. Service having been made, the defendant appeared and set up several defences, which are fully exhibited in its answer filed in the case. Certain proceedings followed, which it is not necessary to notice, as the parties by consent waived a jury and submitted the cause to the Circuit Court upon an agreed statement of facts. Hearing was had, and the Circuit Court rendered judgment in favor of the plaintiff for the amount of the note and costs of suit, and the defendant sued out the present writ of error.

Eight errors are assigned, but it will not be necessary to give the several assignments a separate examination, as the questions presented do not properly involve more than three material propositions :- 1. That the cause of action is barred by a former recovery in an action by the plaintiff against the indorsers of the note. 2. That the plaintiff, inasmuch as it holds the note as collateral security for a pre-existing debt, is not a *bona fide* holder of the same within the meaning of the commercial rule which shuts out proof of equities between the antecedent parties to the instrument. 3. That by the law of the State the plaintiff, in view of the facts exhibited in the agreed statement, is not entitled to the benefit of that rule, and that the law of the State in that regard furnishes in such a case the rule of decision in the Federal courts.

Special findings were made by the Circuit Court, from which it appears that the defendant was the maker of the note, and that it was payable to the order of its treasurer, by whom it was indorsed in blank, and that it was also indorsed by the firm of Palmer & Company, consisting of the president and financial agent of the corporation defendant.

Enough appears to show that the note was made and indorsed for the sole purpose of raising money for the use of

the defendant, nothing having been paid to either of the indorsers for their indorsement. When duly executed and indorsed in blank, the defendant placed the note with others in the hands of a firm of note-brokers for sale to raise money for its use. Prior to that, the same note-brokers had frequently borrowed money from the corporation plaintiff; but they did not keep any account with the bank, and had no other transactions with the same than those set forth in the findings of the court.

Twelve call-loans at seven per cent interest were made at different times by the plaintiff to the note-brokers on collaterals, as specifically enumerated and described in the findings, each of which was separate and had no reference to any other, and it appears that each was made upon a separate lot of collaterals. Two of those loans, to wit, the one for $36,000, and the last one, which is for $10,000, will be the subject of special comment in disposing of the case.

Before the brokers applied for the loan of $36,000, it appears that they had paid all their previous loans obtained from the plaintiff, and that they procured the loan upon collaterals, among which was the note for $36,000 described in the findings. Other banks or capitalists made loans to these brokers, taking collaterals as security, and the plaintiff three weeks later loaned them $10,000 more, taking as security the four notes mentioned in the findings.

Adequate collaterals were at that time held by the plaintiff for each of those loans, but it appears that the promisors of one of the collaterals given for the last loan, within eleven days after the money was advanced, failed in business and became notoriously bankrupt, and that knowledge of that fact reached the plaintiff. Prior to that, it was known that the brokers who negotiated the loans were insolvent, and the findings show that they, at the request of the plaintiff, executed and delivered to it the instrument exhibited in the transcript, in which they agreed that all securities, bonds, stocks, or other property deposited by them with the plaintiff might be held by it, and be deemed security for all their indebtedness to the plaintiff, as more fully set forth in the findings.

Certain advances were made by the brokers to the defend-

ant, by reason of which the latter became indebted to them in the sum of $600, and it appears that the defendant tendered that sum both to the brokers and the plaintiff, and demanded the return of note in suit.

Payment in full of the large note was obtained by the plaintiff out of the collaterals originally deposited with it for that purpose, and it appears that the moneys collected from those collaterals exceeded the amount of that loan by the sum of $2,403.61, so that the entire balance remaining due on the last loan was $5,906.99.

Process to enforce payment was first sued out against the indorsers, and in that action the plaintiff recovered judgment in the sum of $600, which sum, with the costs of suit, was duly paid; and it appears that the balance due, deducting the collections from the collaterals and the judgment against the indorsers, is $5,136.68, for which, with interest and costs, the judgment was entered in the Circuit Court.

Judgments rendered in courts of competent jurisdiction are conclusive between the parties and privies until the same are reversed or in some manner set aside and annulled.

When a fact has once been tried and decided by a court of competent jurisdiction, it cannot be again contested between the same parties or their privies in the same or any other court, if it appear that the same matter was directly involved in the pleadings and that the merits of the cause were decided in the first case.

Parties and privies in such a case are bound by the estoppel, but the holder of a negotiable bill of exchange or promissory note may pursue his remedy against the indorsers as well as the immediate promissory party. Consequently, as stated by Mr. Bigelow, an indorsee of a bill of exchange or promissory note may sue all the prior parties concurrently or successively at his election, subject to the condition that he is entitled to but one satisfaction. Bigelow, Estoppel (2d ed.), 55; *Bishop* v. *Haywood*, 4 T. R. 478; *Britten* v. *Webb*, 2 Barn. & Cress. 483; *Windham* v. *Wither*, 1 Stra. 515; *Burgess* v. *Merrill*, 4 Taunt. 468; *Farwell* v. *Hilliard*, 3 N. H. 318; *Porter* v. *Ingraham*, 10 Mass. 88.

Authorities to show that the holder in such a case is not

estopped to sue the maker because he has recovered judgment against the indorser are numerous and decisive. *Russell & Erwin Manuf. Co.* v. *Carpenter*, 5 Hun (N. Y.), 162; Story, Promissory Notes (7th ed.), sect. 401; *Pritchard* v. *Hitchcock*, 6 Man. & G. 151, 201.

Suppose that is so, then it is insisted by the defendant that the plaintiff is not a *bona-fide* holder for value in the usual course of business within the meaning of the commercial law.

Questions of fact are set at rest by the findings, from which it appears that the note is payable to the treasurer of the defendant or order, by whom it was indorsed in blank as well as by the firm, consisting of the president and financial agent of the company; that it was placed by the maker in the hands of the brokers for sale to raise money for the use of the maker, and that the plaintiff loaned the full amount of the note to the agents of the defendant and took the note indorsed in blank as collateral security for the loan before maturity. None of these matters are disputed, and it is equally and undeniably true that the whole of the money loaned went into the hands of the defendant, in pursuance of the arrangement it made with its own agents.

Neither fraud nor mistake is alleged or even suggested in respect to any one of these matters, from which it follows, as a necessary legal conclusion, that the plaintiff became the actual holder of the note in good faith before maturity by delivery from the agents of the defendant, and that it as such assumed the responsibility to demand payment of the maker when the note fell due, and, if not paid, to give the required notice of non-payment to the indorsers.

Beyond all question, the findings show that the plaintiff in good faith became a party to the note described in the declaration before maturity, and that as such holder it was bound to adopt proper measures to fix the liability of the indorsers, and that if it had failed to demand payment of the maker, or to give the required notice to the indorsers, it would have become liable to the party from whom it received the note for whatever loss ensued from such neglect. Such a holder of a foreign bill of exchange, if not paid at maturity, must see that it is duly protested; and for the same reason the holder of an inland

bill or negotiable promissory note must see to it that proper steps are taken, in case of non-payment by the acceptor or maker, to fix the liability of parties to the instrument who would otherwise be discharged.

Securities of a negotiable character may be transferred by indorsement made at the time they are delivered, or if indorsed in blank or made payable to bearer, they may be transferred by mere delivery without any new indorsement. In either case, the holder, other things being equal, acquires full title to the instrument, the correct commercial rule being that whoever lawfully and in good faith becomes the holder of a valid negotiable bill of exchange or promissory note before maturity, by direct indorsement or by delivery when indorsed in blank or made payable to bearer, assumes the responsibility, if not paid when it falls due, of entering protest or of making demand and giving notice of non-payment as the case may require; and, that in all cases of such a transfer the holder, whether he paid cash for the note or made new advances to the transferrer, or accepted it in substitution of prior collaterals surrendered, or received it in payment of property sold or of antecedent indebtedness, or as collateral security of a pre-existing debt or any pecuniary liability for the pledgor, is a holder for value in the usual course of business within the meaning of the commercial law, and is unaffected by any equities between the antecedent parties, provided he took it in good faith and without notice of anything to impeach the title of the person from whom it was received.

Authorities everywhere agree at the present time that a *bona fide* holder of a negotiable instrument for a valuable consideration, without notice of anything which impeaches its validity, if he takes it under an indorsement made before maturity, holds the title unaffected by any equities between the antecedent parties, even though as between them it may be without any legal validity. *Swift* v. *Tyson*, 16 Pet. 1, 15.

Instruments of the kind are commercial paper in the strictest sense, and must ever be regarded as favored securities, on account of their universal convenience in mercantile transactions and the settled rule is that transferees of the same hold the instrument clothed with the presumption that it was nego-

tiated for value, in the usual course of business, at the time of its execution, and without notice of any equities between the antecedent parties to the instrument. *Collins* v. *Gilbert*, 94 U. S. 753.

Possession of such an instrument before maturity, if indorsed in blank or payable to bearer, is *prima facie* evidence that the holder is the owner and lawful possessor of the same; and nothing short of proof that he had knowledge, at the time he took it, of the facts which impeach the title as between the antecedent parties, not even gross negligence, if unattended with *mala fides*, is sufficient to overcome the effect of that evidence, or to invalidate the title of the holder supported by that presumption. *Goodman* v. *Harvey*, 4 Ad. & E. 870; *Goodman* v. *Simonds*, 20 How. 343, 365; *Bank* v. *Leighton*, 2 Exch. Rep. 61; *Wheeler* v. *Guild*, 20 Pick. (Mass.) 545, 550; *Magee* v. *Badger*, 34 N. Y. 247, 249.

Apply that rule in an action by the transferee against the maker of a negotiable note indorsed in blank, or payable to bearer, and it is clear that he has nothing to do in the opening of his case except to prove the signatures to the instrument and introduce the same in evidence, as the instrument goes to the jury clothed with the presumption that the plaintiff became the holder of the same for value at its date in the usual course of business, without notice of anything to impeach his title. *Pettee* v. *Prout*, 3 Gray (Mass.), 502; *Way* v. *Richardson*, id. 412.

Clothed as the instrument is with the described presumption, the plaintiff is not bound to give any evidence to show that he gave value for the same until the other party has clearly proved that the consideration was illegal, or that the instrument was fraudulent in its inception, or that it had been lost or stolen before it came to the possession of the holder. *Fitch* v. *Jones*, 5 El. & Bl. 238; *Smith* v. *Braine*, 16 Ad. & E. N. S. 242; *Hall* v. *Featherstone*, 3 H. & N. 282.

Cases arise where the supposed defect or the infirmity of the title appears on the face of the instrument; and where that is so, the question whether the party who took it had notice or not is in general a question of construction, and must be determined by the court as matter of law. *Andrews* v. *Pond*,

13 Pet. 65; *Fowler* v. *Brantley*, 14 id. 318; *Brown* v. *Davis*, 3 T. R. 86.

Decided cases of the highest authority support that proposition, but it is a very different matter when it is proposed to impeach the title of the holder by proof of facts and circumstances outside of the instrument itself, as he is then to be affected, if at all, by what has occurred between other parties. For his own acts he is plainly responsible, but he may well claim exemption from any consequences flowing from the acts of others, unless it be first clearly shown that he had knowledge of such facts and circumstances at the time he became the holder of the instrument. Actual knowledge of such facts and circumstances must be proved to defeat the title of the holder; and the question whether he had such knowledge or not is a question of fact for the jury, and, like other questions of *scienter*, must be submitted to their determination.

Indorsers of negotiable securities enjoyed the protection of that rule for ages before any successful attempt was made to annex to it any qualification, unless it appeared that the consideration was illegal, or that the instrument was fraudulent in its inception, or that it had been lost or stolen before it came to the possession of the holder. *Hinton's Case*, 2 Show. 235; *Anonymous*, 1 Salk. 126; *Miller* v. *Race*, 1 Burr. 452; *Grant* v. *Vaughan*, 3 id. 1516; *Peacock* v. *Rhodes*, 2 Doug. 633; *Lawson* v. *Weston*, 4 Esp. 56.

Throughout the whole period covered by those decisions it was universally understood that the title of the *bona fide* holder was unaffected by any equities between the antecedent parties; but it was subsequently decided that if the indorser of the instrument had no valid title to the same, and that such facts and circumstances were known to the indorsee, at the time of the transfer, as would have caused a person of ordinary prudence to suspect that the indorser had no right to transfer the instrument or to use the same for his own benefit, then the holder, as against the acceptor or maker, is not entitled to recover. *Gill* v. *Cubitt*, 3 Barn. & Cress. 466.

For a brief period that rule was followed, but it was never satisfactory, and at the end of twelve years was distinctly overruled in the tribunal where it was first promulgated.

*Goodman* v. *Harvey*, 4 Ad. & E. 870; *Arbouin* v. *Anderson*, 1 Ad. & E. N. S. 498.

We must hold, said Lord Denman, in the case last cited, that the owner of a bill of exchange is entitled to recover upon it if he has come by it honestly, and that that fact is implied *prima facie* by possession, and that, to meet the inference so raised, fraud, felony, or some such matter must be proved.

Abundant authority to support the proposition that the case which for a period relaxed that rule has been overruled for more than half a century is found in the reported cases already cited, and Mr. Chitty says that the old rule of law, that the holder of a negotiable security transferable by delivery can give a title, which he himself does not possess, to a person taking the same *bona fide* for value, is by those decisions again re-established in its fullest extent. Chitty, Bills (13th ed.), 257; *Worcester County Bank* v. *Dorchester & Milton Bank*, 10 Cush. (Mass.) 491. Conclusive support to that conclusion is found in decisions not previously cited and in the text-writers of the highest authority. *Bank of Pittsburgh* v. *Neal*, 22 How. 96; *Murray* v. *Lardner*, 2 Wall. 110.

Nothing short of fraud, not even gross negligence, says Mr. Justice Story, if unattended with *mala fides* on the part of the taker of the instrument, will invalidate his title so as to prevent him from recovering the amount. Story, Promissory Notes (7th ed.), sect. 382. Every person, says the same learned author, is treated in the sense of the rule as a *bona fide* holder for value, not only who has advanced money or other value for it, but who has received it in payment of a precedent debt, or has a lien on it, or has taken it as collateral security for a precedent debt, or for future as well as for past advances. Story on Bills (4th ed.), sect. 192.

During the period the modified rule referred to was recognized as good law in the courts of the country where it was first promulgated, it must be admitted that the courts of several of the States in our own country accepted the same rule, and that the pernicious effects resulting from those examples are still to be seen in some of the more recent State decisions. Attempt was made at one time to maintain that the holder of a negotiable security, if he received it as *payment* of a precedent

debt, could not be regarded as a *bona fide* holder for value in
the usual course of business, even though he took it without
notice of any defect in the title of the transferrer, or of any
equities between the antecedent parties; but that erroneous
rule of decision is abandoned and overruled. *Bank of St. Albans*
v. *Gilliland*, 23 Wend. (N. Y.) 311; *Small* v. *Smith*, 1 Den.
(N. Y.) 583, 586; Edwards, Bills and Notes (2d ed.), 322.

Reported cases also show that it was decided during that
period in the courts of the same State that if a party in good
faith took a negotiable security of a holder without due inquiry,
or with knowledge of such facts and circumstances as would
put a prudent man upon inquiry in making purchases of per-
sonal property, he would not acquire a good title to the instru-
ment, if it appeared that equities existed between the antecedent
parties, and that vigilant inquiry would have enabled the taker
to have ascertained the true character of those equities; but
the appellate tribunal of the State has exploded that legal her-
esy as applied to negotiable securities, and has in that respect
adopted the true commercial rule as administered in the courts
of Westminster Hall. *Pringle* v. *Phillips*, 5 Sandf. (N. Y.)
157; *Welch* v. *Sage*, 47 N. Y. 143, 147.

Prior to the decision in the case of *Gill* v. *Cubitt*, the rule
was that nothing short of proof of knowledge of the facts and
circumstances constituting the equities between the antecedent
parties would enable the maker to defend the suit of the holder;
but the court in that case decided that the transferee could
not recover if the circumstances under which the transfer took
place were such as would naturally have excited the suspicion
of a prudent and careful man. State court decisions in many
cases followed that erroneous theory; but the case itself has
been authoritatively overruled in the tribunal where it had its
origin, and the old rule as re-established by the later adjudica-
tions has been in repeated instances adopted by this court and
by the highest courts of the State where the present controversy
arose. *Goodman* v. *Harvey*, 4 Ad. & E. 870; *Goodman* v. *Si-
monds*, 20 How. 343, 364; *Seybel* v. *National Currency Bank*, 54
N. Y. 288, 295; *Dutchess Insurance Co.* v. *Hachfield*, 73 id. 226.

Much progress, it will be seen from the preceding observa-
tions, has been made within the last thirty years in securing

uniformity of decision in respect to mercantile controversies between the Federal, and State courts, and the courts of this country and those of the parent country, from which most of our commercial rules and usages are derived. *Howry* v. *Eppinger*, 34 Mich. 29.

Concede all that, and still it is insisted by the defendant that the plaintiff took the note merely as a collateral security for a pre-existing debt, without any present consideration at the time of the transfer, and that a party who takes a negotiable security under such circumstances cannot be regarded as acquiring it in the usual course of business, and consequently that he takes it subject to prior equities. Many decisions of the courts of the State concur that if there is a present consideration at the time of the transfer, independent of the previous indebtedness, a party acquiring a negotiable bill of exchange or promissory note before maturity as a collateral security for a pre-existing debt, without knowledge of the facts which impeach the title as between the antecedent parties, thereby becomes a holder in the usual course of business, and that his title is complete, so that it will not be affected by any prior equities between other parties, at least to the extent of the debt for which it is so held. *White* v. *Springfield Bank*, 3 Sandf. (N. Y.) 222; *New York Marbled Iron Works* v. *Smith*, 4 Duer (N. Y.), 362.

When commercial paper is pledged by the apparent owner before it matures as collateral security for advances, the pledgee in good faith is entitled to hold it for the amount of such advances, though it turns out afterwards that the party making the pledge was a mere agent for the true owner, and that the transaction was a breach of duty to the principal. *Belmont Branch Bank* v. *Hoge*, 35 N. Y. 65; *Murray* v. *Beckwith*, 81 Ill. 43.

Where full value is paid by the pledgee, and the transfer is made before maturity, without notice of any prior equities between the antecedent parties, the title of the holder of the security is not subject to be defeated by proof that he might have obtained such notice by the exercise of active vigilance. Cash advances or the sale of goods or other property will constitute a good consideration for the transfer; nor is such a pay-

·ment or sale indispensable, as it is equally well settled that the·
actual discharge of a precedent debt, or the surrender of prior
collaterals, or a binding agreement to give time for the pay-
ment of a debt then due, will have the same effect. *Elting* v.
*Vanderlyn*, 4 Johns. (N. Y.) 237; *Morton* v. *Burn*, 7 Ad. & E.
19; *Jennison* v. *Stafford*, 1 Cush. (Mass.) 168; *Baker* v. *Walker*,
14 Mee. & W. 465; *Walton* v. *Mascall*, 13 id. 452; *Wheeler*
v. *Slocum*, 16 Pick. (Mass.) 62; *Kearslake* v. *Morgan*, 5 T. R.
513.

Examples given by Mr. Justice Story show that the receiv-
ing a note as security for a debt, or forbearance to sue a present
claim or debt, or an exchange of securities, or becoming a
surety, or doing any other act at the request or for the benefit
of the maker or indorser, will constitute a sufficient considera-
tion for a note as well as the payment of money, or the making
of advances, or giving credit, or the discharge of a present
debt, or the performance of work or labor at the request of the
party. Story, Promissory Notes (7th ed.), sect. 186.

Differences of opinion, however, still exist where the transfer
is made as a collateral security for a pre-existing debt, without
any other consideration than what flows from the nature of·
the contract at the time the instrument is delivered, and such
as may be inferred from the relation of debtor and creditor in
respect to the pre-existing debt.

Further argument to show that where negotiable paper is
received in payment and extinguishment of a pre-existing debt
·the holder is entitled to protection is quite unnecessary, as the
authorities in support of the proposition, even in this country,
are quite too numerous for citation. *Townsley* v. *Gamrall*
2 Pet. 170, 182; Parsons, Bills and Notes, 221.

Nor is it necessary to add anything to prove that the title of
the holder is good if he took the note outright for goods or
other property sold and delivered to the transferrer of the note
at the time the transfer was made. All this is admitted, or if
not admitted is so fully established by authority as not to re-·
·quire any further argument in its support. Substantial uni-
formity of judicial opinion exists both in this country and in
England to that extent, but there is still some diversity of
decision in this country upon the question whether the same

conclusion will follow where the negotiable security is trans-
ferred a collateral security, without any other consideration
than the delay of payment incident to the transaction and
what flows from the relation of debtor and creditor in respect
to the existing debt and the obligation which the transferee
assumes by the reception of the negotiable instrument before
maturity. Standard decisions of the State courts are referred
to by the defendant where it is held that the title of the
holder under such circumstances is not good. *Bay* v. *Codding-
ton*, 5 Johns. (N. Y.) Ch. 54, 59 ; *Coddington* v. *Bay*, 20 Johns.
(N. Y.) 637, 644; *Stalker* v. *McDonald*, 6 Hill (N. Y.) 93, 95.

Sixty years have elapsed since the commercial rule adopted
and enforced by that series of decisions was first promul-
gated, and yet it does not and never has commanded the
slightest countenance from any court sitting in Westminster
Hall. Earnest differences of opinion existed in that country
among judicial men in respect to the extent of the protection
which the commercial law afforded to a *bona fide* holder of a
negotiable security against the equities between the antecedent
parties, but there is no authentic evidence that any substantial
diversity of opinion ever arose in the courts of that country
touching the question under consideration.

Partners engaged in business being in want of available
means, the senior member gave his note to a bank to enable
the firm to overdraw their account, and the junior member
gave his note to the maker of the first note for half the amount.
In the course of subsequent transactions the payee of the last
note indorsed it to his creditors as collateral security for a pre-
existing debt. Payment of the note being refused, the holders
sued the maker, who made defence that the plaintiffs were not
*bona fide* holders; but the court held otherwise, and rendered
judgment in favor of the plaintiffs, separate opinions being
given by all the justices of the court. *Heywood* v. *Watson*, 1 M.
& P. 268; s. c. 4 Bing. 496.

Consideration was given for the note in the case of *Percival*
v. *Frampton* (2 C., M. & R. 180), but the court unanimously
held that, if the note had been transferred merely as a collateral
security for a previous debt, the plaintiffs might properly be
described as holders for a valuable consideration.

Holders of a negotiable security transferred before maturity as a collateral security for a pre-existing debt become parties to the instrument to such an extent that they assume the responsibility of making demand and giving the required notice to fix the liability of the indorser; and it is held that where a creditor received such a security from the debtor and failed to make seasonable demand of payment, that his laches as between himself and his debtor were equivalent to the payment of the collateral. *Peacock* v. *Purcell*, 14 C. B. N. S. 728; *Taylor* v. *Williams*, 11 Metc. (Mass.) 44.

Proof of fraud may defeat the right of the holder in such a case, but where there is no such proof the settled rule in England is that a party taking a negotiable instrument as a collateral security takes it for a sufficient consideration and is entitled to recover. *Poirier* v. *Morris*, 22 Law J. Rep. N. S. Q. B. 313; s. c. 2 El. & Bl. 89, 104.

Securities of the kind were deposited by the defendant with the plaintiffs as collaterals for a pre-existing debt, among which was the check in controversy, and it appeared that the defendants having failed to pay the debt the plaintiffs brought an action on the check, the defence being the want of consideration and that the plaintiffs were not holders for value; but the Court of Exchequer ruled otherwise, and rendered judgment in favor of the plaintiffs, from which the defendant appealed to the Exchequer Chamber. Both parties were fully heard in the appellate tribunal, and the court decided that the title of a creditor to a negotiable security transferred to him on account of a pre-existing debt, if received *bona fide*, without notice of any infirmity in the title of the debtor, is indefeasible, whether the instrument is payable at a future time or on demand. *Currie* v. *Misa*, Law Rep. 10 Ex. 153.

Questions of various kinds, it seems, were discussed in the subordinate court; but the statement of the justice who gave the opinion of the court in the appellate tribunal is, that the argument was addressed almost entirely to the question whether an existing debt formed of itself a sufficient consideration for a negotiable security payable on demand, so as to constitute the creditor to whom it was paid a holder for value; and the court, Justice Lush giving the opinion, decided that question in the

affirmative... His reasons for the conclusion are cogent and satisfactory, and in the course of the opinion he remarked that " it was not disputed on the argument, nor could it be, that if instead of a check the security had been a bill or note, payable at a subsequent date, however short, the plaintiffs' title would have been unimpeachable ; " to which he also added, that the proposition had been established by many authorities, both in that country and in the American courts.

No attempt was made to controvert that proposition as applied to bills or notes payable at a future day; but the defendant insisted that inasmuch as the check was payable on demand the rule did not apply, as there was no consideration, because it could not be implied that there was any agreement for delay. Suffice it to say in that regard that the court decided that the supposed distinction " had no foundation either in principle or upon authority," and proceeded to remark that it does not follow that the legal element of consideration is entirely absent where the security is payable immediately.

Forbearance is doubtless a good consideration for the transfer of such an instrument; but a valuable consideration in the sense of the law, as the court remarked in that case, may consist either in some right, interest, profit, or benefit accruing to the one party, or some extension of time of payment, detriment, loss, or responsibility given, suffered, or undertaken by the other.

Call-loans may be regarded as payable on demand, and, inasmuch as the collateral in this case was payable at a future day, the implication is not an unreasonable one that the arrangement operated as an injury to the holder and as a benefit to the debtor and pledgor. Such a reason may doubtless have weight; but it is by no means certain that it is the true foundation of the title of the holder, as other authorities hold that a negotiable security transferred for such a purpose is in some sense a conditional payment of the debt, the condition being that the debt revives if the security is not realized. *Belshaw* v. *Bush*, 11 C. B. 191–205; *Griffiths* v. *Owen*, 13 Mee. & W. 58, 64.

Still not satisfied, the defendant in the case (*Currie* v. *Misa*) appealed from the judgment of affirmance rendered in the

Exchequer Chamber to the House of Lords.    Much instruction is derived in respect to the issue between the parties by referring to the propositions maintained by the counsel of the appellant, of which the following are the most important : 1. That there was a total failure of consideration, inasmuch as the defendant Misa never received any value for his' draft except the four bills which were dishonored.    2. That the check in question was not a bill of exchange, nor a promissory note, nor an order for the payment of money on demand. 3. That the existence of a past debt is not a sufficient consideration for the transfer of the check.

Enough is reported of the arguments for the appellant to show that nothing was left undone by his counsel in their power to do to sustain those propositions; but the learned judges overruled them all, and affirmed the judgment rendered in the two lower courts.    In giving the principal opinion, Lord Chelmsford said that he entertained no doubt that, as between the defendant and the depositor of the check, there was a sufficient consideration, and that the bankers were holders for value, and he proceeded to remark that the counsel of the appellant admit that if the judges are of that opinion it will dispose of the case.    All the judges concurred that the holders were holders' for value, and the result was the same as in the court of original jurisdiction.    *Misa* v. *Currie*, 1 App. Cas. 554, 563.

Corresponding views are held in the Queen's Bench, in the Court of Appeals, and in the High Court of Chancery.    Where a party by means of a false pretense, or condition which he does not fulfil, procures another party to give him a note or acceptance in favor of a third person, to whom he pays it and who receives it *bona fide* for value, the Queen's Bench decided that the giver remains liable to pay the same, because his acceptance or transfer of the same imports value *prima facie*, and he can only relieve himself from his promise to pay the holder by showing that he is not a holder for value, or that he received the instrument in bad faith, or with notice of its infirmity.    *Watson* v. *Russell*, 3 B. & S. 34, 40.

Two of the justices concurred in that proposition without any qualification, and the Chief Justice also concurred in the

same to the extent of the debt of the holder it was pledged to secure, which is the same rule that Shaw, C. J., with the concurrence of all his associates, adopted nearly twenty years earlier. *Chicopee Bank* v. *Chapin*, 8 Metc. (Mass.) 40.

Commercial securities, when transferred to discharge a pre-existing debt, it is admitted, give the holder a good title which will shut out prior equities; and the Court of Appeals in a recent case decided that there was no difference in that regard between past and present consideration to be found in the books, and held that the transfer of a bill of lading for a valuable consideration to a *bona fide* transferee defeats the right of stoppage *in transitu* of the unpaid vendor of the goods, although the consideration was past and not given at the time the bill of lading was delivered to the transferee by the lawful holder. *Leask* v. *Scott*, 2 Q. B. D. 376, 380.

Certain bankers pressed their debtors for better security, and the debtors, having promised to comply with the request, hypothecated merchandise for the purpose, evidenced by warehouse certificates, which the debtors agreed to deliver as soon as they could be procured from the warehouse. They, the debtors, procured the warrants, but refused to deliver the same, when the plaintiffs instituted the present suit, to which the respondents demurred, insisting that the existence of the debt is no sufficient consideration for such an agreement. Among other things, the respondents contended that the allegations of the bill did not exhibit a transaction where the complainants promised to abstain from suing their demand for any certain time; but the Vice-Chancellor held that the bankers did in effect give, and that the respondents did receive, the benefit of some degree of forbearance and benefit that they would not have obtained if they had not made the agreement, and the demurrer was accordingly overruled. *Alliance Bank* v. *Broom & Co.*, 2 Drew. & Sm. 289.

Without more, these authorities are sufficient to show that there is but one voice upon the subject in the courts of the parent country, and that they, speak to the point with a degree of unanimity and uniformity well calculated to excite admiration and to inspire confidence that the rule of decision is both correct and just. Not only every court, but every

judge of every court, in that country concurs in the proposition, that the holder of such a negotiable security, before maturity, as collateral to a pre-existing debt without notice of any prior equities, is a *bona fide* holder for value in the usual course of business, and that his title to the instrument is good, and wholly unaffected by any such prior equities between the antecedent parties. Text-writers everywhere adopt the same rule, and recognize and commend it as the correct and true rule of decision.

So, if a bill or note be indorsed as a *collateral security*, says Chitty, that is an adequate consideration to enable the party to sue thereon, though he advanced no new credit on the bill or note at the time; and he lays down the same rule as to the receipt of a bill or note in payment of a pre-existing debt. Chitty, Bills (13th ed.), 74.

In the ordinary course of things, says Mr. Justice Story, the holder is presumed to be the *prima facie* holder of such a security for value, and he is not bound to give evidence that he gave any value for it, until the other party establishes the want or failure or illegality of the consideration, or that the bill had been lost or stolen before it came to the possession of the holder. It may then be incumbent on him to show that he has given value for it, because he ought not, under such circumstances, to be placed in a better situation than the antecedent parties through whom he obtained the instrument. Story, Bills (4th ed.), sect. 193; Story, Notes (7th ed.), sects. 195, 196.

A creditor, says Byles, may agree to take a bill as collateral security for a debt already due, without affecting his present right to sue for the debt; but, if a creditor elects so to do, he becomes the trustee to that extent of the debtor, and is bound to perform the duties of a holder in respect to presentment and notice of dishonor, and, if he fail to do so, the parties only liable conditionally are discharged, as no one but the actual holder can perform those duties. Byles, Bills (5th Am. ed.), 369; *Peacock* v. *Purcell*, 32 L. J. 256; s. c. 14 C. B. N. S. 728.

Litigated cases often arise where there is a present consideration given for the transfer; and Mr. Daniel regards it as

agreed that the holder of the collateral security, in all such cases, is a *bona fide* holder for value, if he took the security without notice of any equities between the antecedent parties, or if there was any agreement, express or *implied*, to give time of payment of the debt to the debtor ; but he admits that, where neither of these conditions exists in the case, the question is one of more difficulty. Those two propositions he supports by sound reasons and convincing suggestions, and then proceeds to examine the argument for and against the proposition, that the same conclusion should be reached even where there is no new consideration other than what arises from the relation of debtor and creditor, nor any express agreement to extend the time of payment. His view is, that the issue in such a case must turn upon the question whether there is any implied suspension of the prior debt until the collateral becomes due, and that an implied agreement is as binding as one expressed in terms, of which it is supposed no one entertains the least doubt.

Different examples are put by the author, and the proper presumption in each supposed case is stated ; but he finally comes to the conclusion that, inasmuch as the holder in such a case becomes a party to the collateral security, and that he thereby assumes the burden as such holder of fixing the liability of the indorser, he is properly to be regarded as a holder for value, if he took the collateral in good faith and without notice of any equities between the antecedent parties. 1 Daniel, Negotiable Securities (2d ed.), sects. 827–830 ; *Blanchard* v. *Stevens*, 3 Cush. (Mass.) 162, 167 ; *Maitland* v. *Citizens' National Bank of Baltimore*, 40 Md. 540, 564.

Three of the theories involved in the controversy are presented by Mr. Parsons for careful examination : 1. Where negotiable paper is received in payment of an antecedent debt ; but further discussion of that topic is unnecessary, as it is conceded in this case that the title of the holder in such a case is as good as if the contents were paid in cash. 2. Where it is received as collateral security for a pre-existing debt. 3. Where it is received as collateral security for a debt contracted at the date of the transfer.

Two objections, as the author states, are usually taken to each of the last two theories : 1. That, as no new consideration

is paid by the holder, he is not injured by the impeachment of his title.   2. That such a transfer as is supposed in either of the last two cases is not one made in the usual course of business.

Transfers of negotiable securities, for the purpose supposed, are seldom made, except in the execution of some agreement or understanding, by which the transferrer is to be benefited ; as by delay or forbearance or further credit, or the giving up of other collaterals, or the substitution of one collateral for another, or the promise to forego the means of obtaining other indemnity or security.

Few cases, it is presumed, arise where the interest of the debtor is not consulted ; so that, if the rule should be confined to the cases falling within the abstract theory of such a defence, the question would cease to be of much importance, nor would, it often be true that, if the title of the holder should be impeached, he would be left in as good condition as he was before. 1 Parsons, Bills and Notes, 219.

Debtors are often benefited by delay, but creditors are usually sufferers.   Transactions of the kind, it is said, are not to be regarded as transfers made in the usual course of business ; but the court is unable to adopt that conclusion, as the statement of the learned author is believed to be correct, that a large part of the use that is made of negotiable paper is as a means of borrowing money or of securing debts previously contracted.

Bills and instruments of the kind, indorsed in blank or payable to bearer, when transferred to an innocent holder create the same liability as if indorsed at the time of the transfer. Where a party executed such a note to take up a prior note, and his agent delivered it to a third person as collateral security for his own pre-existing debt, Shaw, C. J., held that the holder took a good title as against the maker to the extent of his debt, but that he could not recover any more than the amount of his pre-existing debt.   *Stoddard* v. *Kimball*, 6 Cush. (Mass.) 469.

Adjudged cases, almost without number, decide that, where the pre-existing debt is discharged, the title of the innocent holder is beyond question ; but frequent attempt is made to show that there is a distinction between taking such a note in

payment of a pre-existing debt and taking it as a collateral security for such a payment. One whose debt is due, says Redfield, C. J., must pay it, or become a bankrupt in the commercial sense. If, instead of money, he gives a bill or note, either on time or at sight, whether this is payment in form or is given as collateral to his debt, he gains time, and is saved from the disgrace and ruin consequent upon stopping payment. Viewed as it may be, the debtor in either case derives the benefit of an implied understanding that the creditor will not immediately press for payment, unless the new security proves unproductive, and, if it does, that the creditor may pursue any other proper remedy. Difference in form between payment and collateral security, it was admitted, existed; but the court unanimously held that there was no difference in principle, provided the indorsement was unqualified, so as to impose upon the holder the obligation to conform to the law merchant in enforcing payment. *Atkinson* v. *Brooks*, 26 Vt. 569, 576.

Other State decisions, too numerous for citation, hold that a party taking a negotiable note in payment of, or as a collateral security for, a precedent debt, is a *bona fide* holder for a valuable consideration, and that he is entitled to the same protection as a holder who receives the same in payment for goods delivered at the time of the transfer, or one who pays cash for the instrument when it is delivered. *Allaire* v. *Hartshorne*, 21 N. J. L. 665; *Hamilton* v. *Vought*, 34 id. 187, 191; *Culver* v. *Benedict*, 13 Gray (Mass.), 7, 10; *Johnson* v. *Way*, 27 Ohio St. 374, 379; *Brush* v. *Scribner*, 11 Conn. 388; *Gwynn* v. *Lee*, 9 Gill (Md.), 138.

Even suppose that the title of the plaintiffs is good under the rule of the commercial law, as understood and administered in the Federal courts, still it is insisted by the defendants that the State courts have adopted a different rule in such a case, and that the State rule of decision is the one applicable in the case before the court. Both parties are citizens of the same State; and it must be admitted that if the State rule is applicable in the case, then the ruling of the Circuit Court is erroneous. Various arguments were advanced in support of the proposition, but the one most pressed is that derived from the thirty-fourth section of the Judiciary Act, which provides that the laws of

the several States, except where the Constitution, treaties, or statutes of the United States otherwise require or provide, shall be regarded as rules of decision in trials at common law in the courts of the United States, in cases where they apply. 1 Stat. 92.

State laws furnish rules of decision in trials at common law in the Federal courts, in cases where they apply, which leaves it plainly to be understood that those laws do not apply in all cases, and it was early decided that they do not apply to the process and practice of the Federal courts. *Wyman* v. *Southard*, 10 Wheat. 1.

In cases depending on the statutes of a State, and more especially in those representing titles to land, the court adopts the construction of the State, where that construction is settled and can be ascertained. *Polk's Lessee* v. *Wendell*, 9 Cranch, 87, 98.

Where any rule of real property has been settled in the State courts, the same rule will be applied by this court that would be applied by them. *Jackson* v. *Chew*, 12 Wheat. 153, 162.

Controversies often arise where this court will refuse to adopt a decision of the State court, as in the construction of a will, unless it appears that the decision has become, by acquiescence, a rule of property in the State. *Lane* v. *Vick*, 3 How. 464, 476.

Three decisions from the State courts show that the rule of decision adopted by the courts of the State at that period support the views of the defendants, and we regret to say that the tendency of some of the later decisions in the same tribunals are in the same direction. *Atlantic National Bank of New York* v. *Franklin*, 55 N. Y. 235.

Such being the fact, it becomes necessary to decide the question whether the decisions of a State court compel this court to apply to the facts of the case a rule of decision, believed to be in direct conflict with the rule of commercial law. Nearly forty years have elapsed since this question was first presented to this court for decision. Doubts were then entertained whether the State rule was absolutely settled; but, for the purposes of the decision, that point was unconditionally ad-

mitted. Then as now the chief argument in support of the proposition was that the question was controlled by the thirty-fourth section of the Judiciary Act, to which the court responded, in the first place, by denying that the word "laws," used in the section, included the decisions of the local tribunals within the scope of its meaning. In the ordinary meaning of language, said Mr. Justice Story, it will hardly be contended that the decisions of the courts constitute laws, adding that, at most, they are only evidence of what the law is, and are not of themselves laws. They are often re-examined, reversed, and qualified by the courts themselves, whenever they are found to be either defective or ill-founded or otherwise incorrect.

His views were that the laws of a State are more usually understood to be the rules and enactments of the legislature, or long established local customs having the force of laws. None, it is believed, can dissent from that view, and we have the authority of that opinion for saying that, in all cases prior to that time, the court had uniformly supposed that the section, when properly interpreted, was limited in its application to State laws strictly local, and the construction thereof by the local tribunals, and to rights and titles to things having a permanent locality, such as the rights and titles to real estate, and other matters immovable and intra-territorial in their nature and character; that the court had never supposed that the section applied, or was designed to apply, to the construction of ordinary contracts or other written instruments, nor to questions of general commercial law

These views were enforced by many other illustrations, and the court decided — every member of the court but one concurring — that the section, upon its true intendment and construction, is strictly limited to local statutes and local usages, and that it does not extend to contracts and other instruments of a commercial nature, the true interpretation and effect of which are to be sought, not in the decisions of the local tribunals, but in the general principles and doctrines of commercial jurisprudence. *Swift* v. *Tyson*, 16 Pet. 1, 18.

Judicial views of a corresponding character were expressed by Lord Mansfield, as Chief Justice of the King's Bench, nearly a century earlier, when he said that the maritime law is not the

law of a particular country, but the general law of nations.. *Luke* v. *Lyde,* 2 Burr. 882.

Mr. Justice Story referred to that case, in support of the decision of the court, and quoted the celebrated maxim of Cicero, which, liberally interpreted, is to the effect that maritime law is not one thing in one Juntry and another thing in a different country, nor one thing to-day and another to-morrow, but that, in all times and nations, it is immutable and imperishable. Translation by Yonge (London, 1853), 360.

Commercial law, says Bouvier, is a phrase employed to denote the branch of the law which relates to the rights of property and the relations of persons engaged in commerce. Persons engaged in commercial adventures, wherever they may have their domicile, have business relations throughout the civilized world, from which it results that commercial law is less local and more international than any other system of law, except the law of nations.

Codes, laws, and ordinances. of other States, says a learned writer, whether ancient or modern, are received by the courts with great respect, not as containing any authority in themselves, but as evidence of the general law merchant. Where these are contradicted by judicial decisions, they cease to have any value in the jurisdiction where the law is decided to be the other way. Levi (2d ed.), 2.

Authoritative support to the proposition, that the decisions of the State courts do not control in such a case, is also derived from other decisions of this court, in which every member of the court concurred. *Carpenter* v. *The Providence Washington Insurance Co.,* 16 Pet. 495, 511.

Insurance against fire in that case was effected by a mortgagor, and one of the questions was as to the amount the insured was entitled to recover. Reported cases from the State reports were referred to as furnishing the rule. of decision. Responsive to that argument, Mr. Justice Story remarked, among other things, that the question presented was a question of general commercial law, involving the construction of an insurance contract, which is by no means local in its character, or regulated by any local policy or customs; that the decisions of the State tribunals are entitled to great respect, but that

they cannot conclude the judgment of this court in such a case; and that this court is bound to interpret the instrument according to its own opinion of its true intent and objects.

Equally decisive views have often been expressed by this court in other cases, of which one deserves special notice. Preliminary to the point decided, the court very properly admitted that the Federal courts will pay due regard to the laws of the States and their construction by the State tribunals; but the court decided, Mr. Justice Harlan giving the opinion, that this court is not bound by the decisions of the State courts in determining a question of general commercial law; that such is the established doctrine of the court, so frequently announced as not to require any extended citation of authorities in its support. *Oates* v. *National Bank*, 100 U. S. 239; *Amis* v. *Smith*, 16 Pet. 303, 314; Conkling's Treatise (5th. ed.), 140.

Argument to show that the decisions of this court referred to contradict the decisions of the State court upon the matter in decision is quite unnecessary, as that is admitted. Nor is it correct to suppose that the leading case, contradicting the views of the State court, is unsupported to its full extent by other decisions of this court. Instead of that, the doctrines of that case were directly and fully reaffirmed in the following case, decided more than twelve years later. *Watson* v. *Tarpley*, 18 How. 517.

State legislation, as shown in that case, had prescribed regulations in respect to the protest of bills of exchange, and notice of their dishonor repugnant to the requirements of the law merchant; and this court held that the State regulations were not operative, and that the payee or indorsee of the bill, in spite of the State law, might enforce his rights in the Federal court, as defined and recognized by the decisions of this court. Reference was there made to the sentiments expressed by Lord Mansfield, that the maritime law was not the law of one country only, but of the commercial world; and the court decided that the commercial law was not circumscribed within any local limits, and that citizens resorting to the Federal tribunals for the ascertainment of their rights might well claim the benefit of the rules of the general commercial law. Six of the

justices of the court, including the Chief Justice, held the same views in the still later case, to which special reference is made. *Goodman* v. *Simonds*, 20 How. 343, 371.

Collaterals, previously held in that case, had been surrendered when the new arrangement was made, and the evidence showed an agreement for forbearance; and the court, in order to prevent a dissent, rested the case, so far as respected the question of consideration, upon those special facts; but it is deemed proper to state that two-thirds of the court entirely approved of the views of Mr. Justice Story, as expressed in *Swift* v. *Tyson*, and in his valuable works upon bills of exchange and promissory notes. Confirmation of the proposition that his views in that decision are correct is also derived from a note appended to the text of the third volume of Kent's Commentaries, by the distinguished author, in which he says that he is inclined to concur in that decision as the plainer and better doctrine. 3 Kent, Com. (12th ed.) 81; Cooley, Const. Lim. (4th ed.) 18.

State decisions, in respect to titles to real estate and transfers of property, usually furnish the rule of decision in the Federal courts, by virtue of the before-mentioned provision of the Judiciary Act; but the established practice is, that it does not apply, except in matters of a strictly local character; that is to say, to the positive statutes of the States and the interpretations of the same by their own tribunals, including rights and titles to things having a permanent locality, such as real property, and that it does not extend to questions of general commercial law, from which it follows that where any controversy arises as to the liability of a party to a bill of exchange, promissory note, or other negotiable paper, in one of the Federal courts, which is not determined by the positive words of a State statute, or its meaning as construed by the State courts, the Federal courts will apply to its solution the general principles of the law merchant, regardless of any local decision. 1 Daniel, Neg. Inst. (2d ed.) sect. 10.

Transactions of a commercial character extend throughout the civilized world, and it is well known that they are chiefly conducted through the medium of bills of exchange and other negotiable instruments. Uniformity of decision is a matter of

great public convenience and universal necessity, acknowledged by all commercial nations. Should this court adopt a principle of decision which when carried into effect would establish as many different rules for the determination of commercial controversies as there are States in the Union, it would justly be considered a public calamity, as it must necessarily depreciate our negotiable securities in all the foreign markets of the world where our merchants have commercial transactions.

. Stable and immutable rules are necessary to give confidence to those who receive such securities in the usual course of business, when indorsed in blank, or made payable to bearer, so that if such a bill or note is made without consideration, or be lost or stolen, and afterwards be negotiated for value to one having no knowledge of such facts, in the usual course of business, his title shall be good, and he shall be entitled to collect the amount.

Uniformity of decision in such cases is highly desirable, and these observations are sufficient to show that nothing is wanting to accomplish that great object but the concurrence of a few more of the State courts, of which none are more to be desired than the courts of New York and Pennsylvania. It is hoped that they will concur at no distant day.

For these reasons the conclusion is that the judgment should be affirmed.

MR. JUSTICE BRADLEY. I concur in the judgment rendered in this case, and in most of the reasons given in the opinion. But, in reference to the consideration of the transfer of the note as collateral security, I do not regard the obligation assumed by the indorsee (the bank), to present the note for payment and give notice of non-payment, as the only, or the principal, consideration of such transfer. The true consideration was the debt due from the indorsers to the indorsee, and the obligation to pay or secure said debt. Had any other collateral security been given, as a mortgage, or a pledge of property, it would have been equally sustained by the consideration referred to; namely, the debt and the obligation to pay it or to secure its payment. If the indorsers had assigned

a mortgage for that purpose, the title of the bank to hold the mortgage would have been indubitable. In that case prior equities of the mortgagor might have prevailed against the title of the bank; because a mortgage is not a commercial security, and its transfer for any consideration whatever does not cut off prior equities. But the *bona fide* transfer of commercial paper before maturity does cut off such equities; and every collateral is held by the creditor by such title and in such manner as appertain to its nature and qualities. Security for the payment of a debt actually owing is a good consideration, and sufficient to support a transfer of property. When such transfer is made for such purpose, it has due effect as a complete transfer, according to the nature and incidents of the property transferred. When it is a promissory note or bill of exchange, it has the effect of giving absolute title and of cutting off prior equities, provided the ordinary conditions exist to give it that effect. If not transferred before maturity or in due course of business, then, of course, it cannot have such effect. But I think it is well shown in the principal opinion that a transfer for the purpose of securing a debt is a transfer in due course. And that really ends the argument on the subject.